1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| AMANDA GEORGINO, an individual, on behalf of herself and all others similarly situated, <br><br> Plaintiff, <br><br> vs. <br><br> SUR LA TABLE, INC., a Washington Corporation, <br><br> Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

CASE NO. CV 11-03522 MMM (JEMx)

ORDER GRANTING FINAL APPROVAL OF CLASS ACTION SETTLEMENT; GRANTING MOTION FOR ATTORNEYS' FEES, COSTS, AND INCENTIVE AWARDS

On February 16, 2011, plaintiff Amanda Georgina filed a class action complaint against Sur la Table, Inc. in Los Angeles Superior Court.[1]  The action was removed to this court on April 25, 2011.[2]  The complaint alleges a violation of the Song-Beverly Credit Card Act of 1971, California Civil Code § 1747.08.[3]  On November 8, 2011, the court ordered that Georgina's

---

[1]Notice of Removal, Docket No. 1 (April 25, 2011), Exh. A ("Complaint").

[2]*Id.* at 1.

[3]Complaint, ¶¶ 30-33.

action be consolidated with two other class action suits filed against Sur la Table for violation of the Song-Beverly Credit Card Act.[4]  The plaintiffs in the other two actions were Nancy Dardarian and Linda Petersen.[5]

On October 8, 2012, the parties filed a notice of settlement.[6]  The court preliminarily approved the settlement on December 11, 2012, and set a final fairness hearing for April 22, 2013.[7]  On February 18, 2013, Georgino, Dardarian and Petersen filed an unopposed motion for attorneys' fees and costs.[8]  They filed a motion for final approval of the class settlement on April 8, 2013.[9]

## I.  FACTUAL BACKGROUND

### A.     Allegations in Georgino's Complaint

Georgino alleges that she purchased goods at a Sur la Table retail store using a credit card.[10]  At the time of checkout, a Sur la Table employee requested that Georgino provide her zip code pursuant to the store's "Information Capture Policy."[11]  Georgino believed she was required to provide the information if she wished to complete her purchase, and thus told the employee her

---

[4]Consolidation of Cases, Docket No. 17 (Nov. 8, 2011).

[5]*Id.*  A petition for multi-district litigation treatment of these actions and actions filed against other defendants for violation of Song-Beverly Credit Card Act was denied. (Order Denying Transfer, Docket No. 18 (Dec. 23, 2011).)

[6]Stipulation for Settlement, Docket No. 27 (Oct. 8, 2012).

[7]Order Granting Preliminary Approval of Class Action Settlement ("Prelim. Order"), Docket No. 32 (Dec. 11, 2012).

[8]Motion for Attorneys' Fees and Costs ("Fees Motion"), Docket No. 36 (Feb. 18, 2013).

[9]Motion for Final Approval of Class Action Settlement ("Approval Motion"), Docket No. 38 (April 8, 2013).

[10]Complaint, ¶¶ 14-16.

[11]*Id.*, ¶ 17.

2

zip code.[12]  Subsequently, the employee swiped Georgino's credit card through an electronic cash register, at which point Sur la Table had captured Georgino's name, credit card number, and zip code.[13]  It purportedly made no effort to erase, strike out, or otherwise delete Georgino's personal identification information from the electronic cash register after Georgino left the store.[14]

Georgino alleges that this conduct violates the Song-Beverly Credit Card Act, which prohibits companies that accept credit cards from requesting and recording personal identification information.[15]

**B.     The Parties' Settlement Negotiations and Terms of the Settlement Agreement**

On August 21, 2012, the parties participated in a full-day mediation session with Michael Dickstein of Dickstein Dispute Resolution.[16]  Prior to mediating, the parties had engaged in substantial formal discovery regarding the scope of the class, the number of transactions at issue, and the merits of the claims.[17]  With Dickstein's assistance, the parties reached a settlement.[18]

The settlement agreement sets the gross settlement amount at $1,635,600.[19]  This includes a payment of at least $1,198,600 to the approximately 92,200 class members presently known, in the form of freely transferrable $13 merchandise certificates that can be used at Sur la Table

---

[12]*Id.*, ¶ 18.

[13]*Id.*, ¶ 20.

[14]*Id.*, ¶ 21.

[15]*Id.*, ¶¶ 30-33.  The allegations in Dardarian's and Petersen's complaints are essentially identical to Georgino's; each plaintiff alleged that she was required to provide personal identification information, in conjunction with a purchase that she paid for with a credit card at a Sur la Table retail store.  (Approval Motion at 1-2).

[16]Declaration of Gene Stonebarger ("Stonebarger Decl."), Docket No. 38 (Apr. 8, 2013), ¶ 3.

[17]*Id.*

[18]*Id.*

[19]Prelim. Order, Exh. A ("Settlement Agreement") at 2.

stores.[20]   The amount also includes a contemplated fee award of $425,000 to class counsel, and a total of $12,000 in incentive payments to the three class representatives.[21]   The settlement agreement provides that, should additional class members be identified, the gross settlement amount will increase and each newly identified class member will receive a $13 merchandise certificate.[22]

Certificates are to be mailed directly to all known class members.[23]   Unknown class members who receive notice of the class may submit a claim form to the settlement administrator, which will be reviewed by Sur la Table to determine if the claim is valid.[24]   By the time plaintiffs filed their motion for final approval, the number of known class members had risen to 98,205, as 446 unknown class members had submitted valid claim forms.   This increased to $1,282,463 the net payment to the class; the gross settlement payment similarly increases to $1,707,463.[25]

## C.   Notice to the Settlement Class

After the court preliminarily approved the class settlement, Sur la Table employed four methods of providing notice to the class.   First, it emailed summary postcard notices, along with merchandise certificates, to 2,370 known class members for whom it had an email address.[26]   Second, it mailed summary postcard notices and merchandise certificates to 95,935 class members for whom it had a valid postal address.[27]   Prior to mailing, Sur la Table had a National Change

---

[20]*Id.*

[21]*Id.*

[22]*Id.*

[23]Approval Motion at 4.

[24]*Id.* at 7.

[25]*Id.* at 4.

[26]Declaration of Eli Winkler ("Winkler Decl."), Docket No. 38 (Apr. 8, 2013), ¶ 4.

[27]*Id.*, ¶ 3.

4

of Address search conducted for each known class member for whom it had an address.[28]  Third, Sur la Table conspicuously posted a summary, in-store notice at the point of sale in each of its California stores.[29]  These notices were posted for at least thirty days.[30]  Finally, the settlement administrator created a settlement website, which provided access to the long-form class notice, the claim form, and the preliminary approval order.[31]

The summary postcard notice sent to class members via email or mail notified class members of the benefit they stood to receive, as well as class members' right to opt out of or object to the settlement.[32]  It also provided the website address for the settlement website and indicated that a full notice concerning the settlement was posted on that site.  Finally, it provided a mailing address for the settlement administrator should class members desire additional information.[33]  The summary notice advised class members that by participating in the class and electing not to opt out, they would be releasing Sur la Table from all claims described in the full notice.[34]

The court's order granting preliminary approval of the settlement required that any class member wishing to object to the proposed settlement file objections postmarked no later than March 11, 2013; as of the date the final approval motion was filed, no objections had been filed.[35]  Similarly, class members wishing to opt out of the settlement class were required to mail a letter indicating that they had elected to opt out no later than March 11, 2013; as of the date the final

---

[28]*Id.*

[29]*Id.*, ¶ 5.

[30]*Id.*

[31]Declaration of Michael Hamer ("Hamer Decl."), Docket No. 38 (Apr. 8, 2013).

[32]Prelim Order, Exh. E ("Summary Notice").

[33]*Id.*

[34]*Id.*

[35]Hamer Decl., ¶ 7.

5

1   approval motion was filed, the settlement administrator had received only two opt out requests.[36]

2

3                              **II.   DISCUSSION**

4       **A.    Certification of the Proposed Settlement Class**

5           "In order to approve a class action settlement, a district court must first make a finding that

6   a class can be certified." *Vasquez v. Coast Valley Roofing, Inc.*, 266 F.R.D. 482, 485-86 (E.D.

7   Cal. 2010) (citing *Molski v. Gleich*, 318 F.3d 937, 943, 946-50 (9th Cir. 2003)); see also *Ortiz*

8   *v. Fiberboard Corp.*, 527 U.S. 815, 848-49 (1999) ("When a district court, as here, certifies for

9   class action settlement only, the moment of certification requires heightened attention to the

10  justifications for binding the class members" (citation omitted)); *Staton v. Boeing Co.*, 327 F.3d

11  938, 952-53 (9th Cir. 2003) ("Especially in the context of a case in which the parties reach a

12  settlement agreement prior to class certification, courts must peruse the proposed compromise to

13  ratify both the propriety of the certification and the fairness of the settlement.  First, the district

14  court must assess whether a class exists; '[s]uch attention is of vital importance, for a court asked

15  to certify a settlement class will lack the opportunity, present when a case is litigated, to adjust

16  the class, informed by the proceedings as they unfold.'  Second, the district court must carefully

17  consider 'whether a proposed settlement is fundamentally fair, adequate, and reasonable,'

18  recognizing that '[i]t is the settlement taken as a whole, rather than the individual component parts,

19  that must be examined for overall fairness . . . ,'" quoting *Amchem Prods. Inc. v. Windsor*, 521

20  U.S. 591, 620 (1997), and *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998)).

21          Class certification is governed by Rule 23 of the Federal Rules of Civil Procedure, which

22  provides that a district court may certify a class only if "(1) the class is so numerous that joinder

23  of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the

24  claims or defenses of the representative parties are typical of the claims or defenses of the class;

25  and (4) the representative parties will fairly and adequately protect the interests of the class."

26  FED.R.CIV.PROC. 23(a).

27  _____

28      [36]*Id.*

1    Parties seeking to maintain a suit as a class action must make a *prima facie* showing that

2    each of these four requirements is met, and must demonstrate that appropriate grounds for

3    pursuing a class recovery exist.  See *Blackie v. Barrack*, 524 F.2d 891, 901 (9th Cir. 1975).  The

4    burden of proving that maintenance of the suit as a class action is appropriate rests on the

5    proponents of the class.  *In re Northern Dist. of California Dalkon Shield IUD Prods. Liab. Litig.*,

6    693 F.2d 847, 854 (9th Cir. 1982).  Failure to satisfy any one of the Rule 23 requirements

7    precludes certification.  *Rutledge v. Electric Hose & Rubber Co.*, 511 F.2d 668, 673 (9th Cir.

8    1975).

9    Although not specifically mentioned in Rule 23(a), there is an additional prerequisite to

10   certification – that the class be ascertainable.  See, e.g., *Lukovsky v. San Francisco*, No. C 05-

11   00389 WHA, 2006 WL 140574, *2 (N.D. Cal. Jan. 17, 2006) ("'Although there is no explicit

12   requirement concerning the class definition in FRCP 23, courts have held that the class must be

13   adequately defined and clearly ascertainable before a class action may proceed,'" quoting *Schwartz

14   v. Upper Deck Co.*, 183 F.R.D. 672, 679-80 (S.D. Cal. 1999)); *Thomas & Thomas Rodmakers,

15   Inc. v. Newport Adhesives & Composites, Inc.*, 209 F.R.D. 159, 163 (C.D. Cal. 2002) ("Prior

16   to class certification, plaintiffs must first define an ascertainable and identifiable class.  Once an

17   ascertainable and identifiable class has been defined, plaintiffs must show that they meet the four

18   requirements of Rule 23(a), and the two requirements of Rule 23(b)(3)" (citation and footnote

19   omitted)); *O'Connor v. Boeing North American, Inc.*, 184 F.R.D. 311, 319 (C.D. Cal. 1998)

20   (holding that a class definition must be "precise, objective and presently ascertainable"); *Bishop

21   v. Saab Auto. A.B.*, No. CV 95-0721 JGD (JRx), 1996 WL 33150020, *4 (C.D. Cal. Feb. 16,

22   1996) ("To file an action on behalf of a class, the named plaintiffs must be members of the class

23   that they purport to represent at the time the class action is certified.  The named plaintiffs must

24   also demonstrate that the class is ascertainable" (citation omitted)).[37]

25

26   [37]See also, e.g., *In re A.H. Robbins Co., Inc.*, 880 F.2d 709, 728 (4th Cir. 1989) (same),

27   abrogated on other grounds by *Amchem Products*, 521 U.S. 591; *Bentley v. Honeywell Int'l, Inc.*,
     223 F.R.D. 471, 477 (S.D. Ohio 2004) ("Before delving into the 'rigorous analysis' required by

28   Rule 23, a court first should consider whether a precisely defined class exists and whether the

A class is sufficiently defined and ascertainable if it is "administratively feasible for the court to determine whether a particular individual is a member." *O'Connor*, 184 F.R.D. at 319; accord *Davoll v. Webb*, 160 F.R.D. 142, 143 (D. Colo. 1995); see also *Buford*, 168 F.R.D. at 347 ("[T]he 'description of the class must be sufficiently definite to enable the court to determine if a particular individual is a member of the proposed class,'" quoting *Pottinger v. Miami*, 720 F.Supp. 955, 957 (S.D. Fla. 1989)).

The parties seek to certify a settlement class of "[a]ll individuals who used a credit card . . . to purchase goods or services from one of [Sur la Table's] retail stores (either in person or over the phone) in the State of California during the period of time between February 16, 2010 through February 11, 2011, and whose personal identification information was requested and recorded by [Sur la Table] for any reason other than a special order, installation, or delivery."[38] "[A]ll the parameters for membership in this class are objective criteria, and [defendant's] business records should be sufficient to determine the class membership status of any given individual." *Hofstetter v. Chase Home Finance, LLC*, No. C 10-01313, 2011 WL 1225900, *14 (N.D. Cal. Mar. 31, 2011) (finding that the ascertainability requirement was satisfied); *Shurland v. Bacci Cafe & Pizzeria on Ogden, Inc.*, 271 F.R.D. 139, 146-47 (N.D. Ill. 2010) (holding that, because "[t]he required analysis – determining only whether the purported class member made a purchase from Bacci within the set dates – [was] a straightforward one," the class was ascertainable); *Saulic v. Symantec Corp.*, 596 F.Supp.2d 1323, 1331 (C.D. Cal. 2009) (concluding that "the transactions [at issue] are by credit card, so the class is ascertainable").

---

named plaintiffs are members of the proposed class"); *Robinson v. Gillespie*, 219 F.R.D. 179, 183 (D. Kan. 2003) ("In determining whether to certify a class, the court begins with the proposed definition of the class" because "[a]bsent a cognizable class, determining whether Plaintiffs . . . satisfy the other Rule 23(a) and (b) requirements is unnecessary" (internal quotations omitted)); *Buford v. H & R Block, Inc.*, 168 F.R.D. 340, 346 (S.D. Ga. 1996) ("Before considering the requirements of Rule 23 . . . a court must determine whether a class exists that can adequately be defined. . . . [C]lass definition is an implicit requirement which must be met before a Rule 23 analysis can be undertaken by the district court").

[38]Approval Motion at 7.

1    **1.    Numerosity**

2    Under the Federal Rules of Civil Procedure, before a class can be certified, the court must

3    determine that the class is "so numerous that joinder of all members is impracticable."  See

4    FED.R.CIV.PROC. 23(a)(1).  "Impracticability does not mean impossibility, [however,] . . . only

5    . . . difficulty or inconvenience in joining all members of the class."  *Harris v. Palm Springs*

6    *Alpine Estates, Inc.*, 329 F.2d 909, 913-14 (9th Cir. 1964) (internal quotations omitted).  There

7    is no set numerical cutoff used to determine whether a class is sufficiently numerous; courts must

8    examine the specific facts of each case in evaluating whether the requirement has been satisfied.

9    See *General Telephone Co. v. EEOC*, 446 U.S. 318, 329-30 (1980).  "As a general rule,

10   [however,] classes of 20 are too small, classes of 20-40 may or may not be big enough depending

11   on the circumstances of each case, and classes of 40 or more are numerous enough."  *Ikonen v.*

12   *Hartz Mountain Corp.*, 122 F.R.D. 258, 262 (S.D. Cal. 1988) (citing 3B J. Moore & J. Kennedy,

13   MOORE'S FEDERAL PRACTICE ¶ 23-05[1] (2d ed. 1987)).

14   The parties have identified almost 100,000 class members.  As a consequence, joinder of

15   all the class members would, as a practical matter, be impossible.  Accordingly, the court finds

16   that the numerosity requirement of Rule 23(a) is satisfied.

17   **2.    Commonality**

18   The commonality requirement "seek[s] to assure that the action can be practically and

19   efficiently maintained [as a class action]."  *Baby Neal v. Casey*, 43 F.3d 48, 56 (3d Cir. 1994).

20   "A class has sufficient commonality 'if there are questions of fact and law which are common to

21   the class.'"  *Hanlon*, 150 F.3d at 1019 (quoting FED.R.CIV.PROC. 23(a)(2)).  "[I]f material

22   variations exist as to the law or facts involved with individual class member injuries, then the

23   commonality requirement [cannot] be met."  *LaDuke v. Nelson*, 762 F.2d 1318, 1332 (9th Cir.

24   1985), as amended, 796 F.2d 309 (9th Cir. 1986).  The commonality requirement of Rule 23(a)(2)

25   is less rigorous than the companion requirements of Rule 23(b)(3), however, and "ha[s] been

26   construed permissively."  *Hanlon*, 150 F.3d at 1019.

27   Ultimately, class members' "claims must depend upon a common contention – for example,

28   the assertion of discriminatory bias on the part of the same supervisor.  That common contention,

moreover, must be of such a nature that it is capable of classwide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mark Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011). Although for purposes of Rule 23(a)(2) even a single common question will suffice, *id.* at 2556, "'[w]hat matters to class certification . . . is not the raising of common 'questions' – even in droves – but, rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation. Dissimilarities within the proposed class are what have the potential to impede the generation of common answers.'" *Id.* at 2551 (citing Nagareda, Class Certification in the Age of Aggregate Proof, 84 N.Y.U.L.REV. 97, 132 (2009)).

Georgino's complaint identifies several common questions of law and fact, including, *inter alia*, whether Sur la Table engaged in a practice of "request[ing] th[at] cardholder[s] . . . provide personal identification information and record[ing] the [information] during credit card transactions."[39] The complaint asserts that Sur la Table had an "Information Capture Policy," which required its employees to request personal information from customers. Whether such a policy or practice exists is at the core of each class member's claim - if Sur la Table had a policy of requesting personal information in the course of every credit card transaction, then each class member's rights under the Song-Beverly Credit Card Act will have been violated. Other courts have found similar common questions sufficient to satisfy Rule 23. See *Yeoman v. Ikea U.S. West, Inc.*, No. 11cv701 WQH (BGS), 2012 WL 1598051, *9 (S.D. Cal. May 4, 2012) (finding that proof of a "uniform policy and practice of requesting personal identification information from customers during credit card transactions" was sufficient to satisfy both Rule 23(a)'s commonality requirement and Rule 23(b)(3)'s predominance requirement). Although it is possible that the precise timing and circumstances of each request for information may vary, proof of a common policy resolves a question common to each class member's claim. *Id.* ("Although Defendant contends that the precise timing of a cashier request for ZIP code information may have varied from immediately after the merchandise was totaled to immediately after the customer indicated

---

[39]Complaint, ¶ 27.

1  whether she would pay with a credit card, the Court's objective evaluation of whether Ikea's

2  request for personal identification information would be perceived as a condition of the credit card

3  payment is not be altered by the distinction").

4          **3.      Typicality**

5          Typicality requires a determination as to whether the named plaintiff's claims are typical

6  of those of the class members she seeks to represent.   See FED.R.CIV.PROC. 23(a)(3).

7  "[R]epresentative claims are 'typical' if they are reasonably co-extensive with those of absent class

8  members; they need not be substantially identical." *Hanlon*, 150 F.3d at 1020; see also *Schwartz*

9  *v. Harp*, 108 F.R.D. 279, 282 (C.D. Cal. 1985) ("A plaintiff's claim meets this requirement if

10  it arises from the same event or course of conduct that gives rise to claims of other class members

11  and the claims are based on the same legal theory").

12          "The test of typicality is whether other members have the same or similar injury, whether

13  the action is based on conduct which is not unique to the named plaintiffs, and whether other class

14  members have been injured by the same course of conduct." *Hanon v. Dataproducts Corp.*, 976

15  F.2d 497, 508 (9th Cir. 1992) (citation and internal quotations omitted).   Typicality, like

16  commonality, is a "permissive standard[ ]." *Hanlon*, 150 F.3d at 1020.   Indeed, in practice,

17  "[t]he commonality and typicality requirements of Rule 23(a) tend to merge." *General Telephone*

18  *Co. of Southwest v. Falcon*, 457 U.S. 147, 157 n. 13 (1982).   Typicality may be found lacking,

19  however, "if 'there is a danger that absent class members will suffer if their representative is

20  preoccupied with defenses unique to it.'" *Hanon*, 976 F.2d at 508 (quoting *Gary Plastic*

21  *Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 903 F.2d 176, 180 (2d Cir.

22  1990)); see also *J.H. Cohn & Co. v. Am. Appraisal Assoc., Inc.*, 628 F.2d 994, 999 (7th Cir.

23  1980) ("[E]ven an arguable defense peculiar to the named plaintiff or a small subset of the plaintiff

24  class may destroy the required typicality of the class as well as bring into question the adequacy

25  of the named plaintiff's representation").

26          Georgino, Dardarian and Petersen each allegedly purchased goods at Sur la Table retail

27  stores, and was asked to reveal personal identification.   There is no indication that the class

28  representatives' individual claims deviate in any manner from the claims of absent class members.

1    See *Yeoman*, 2012 WL 1598051, at *6 (concluding that the typicality requirement was satisfied

2    because "[p]laintiff testified that the cashier swiped her credit card. . . .  Plaintiff has also testified

3    that she was asked to provide her ZIP code information to the cashier").

4                           **4.    Adequacy of Representation**

5           The final prerequisite to certification under Rule 23(a) is that the named plaintiffs be able

6    "fairly and adequately to protect the interests" of all members of the class.  FED.R.CIV.PROC.

7    23(a)(4).   The Ninth Circuit has held that representation is "adequate" when class counsel is

8    qualified and competent, the representatives' interests are not antagonistic to the interests of absent

9    class members, and it is unlikely that the action is collusive.  *Dalkon Shield IUD Prods. Liab.*

10   *Litig.*, 693 F.2d at 855.  In addition, the class representatives must have a sufficient interest in the

11   outcome of the case to ensure vigorous advocacy.  See *Riordan v. Smith Barney*, 113 F.R.D. 60,

12   64 (N.D. Ill. 1986).  Whether this requirement has been met, therefore, turns on two questions:

13   "(a) do the named plaintiffs and their counsel have any conflicts of interest with other class

14   members and (b) will the named plaintiffs and their counsel prosecute the action vigorously on

15   behalf of the class?"  *In re Mego Financial Corp. Securities Litigation*, 213 F.3d 454, 462 (9th

16   Cir. 2000).

17          Here, the named plaintiffs' interests are consistent with those of the absent class members.

18   When the court is asked to certify a settlement class, however, issues of possible collusion merit

19   special consideration.  Often, there is a concern that named plaintiffs will structure a settlement

20   that favors their interests by maximizing current payments and minimizing the funds available to

21   future claimants.  The Supreme Court addressed this issue in *Amchem Products*, 521 U.S. 591,

22   which involved a proposed global resolution of suits against asbestos manufacturers.  The interests

23   of class members who were currently injured as a result of asbestos exposure, and who sought

24   generous immediate payments, conflicted with the interest that exposure only-plaintiffs had in

25   ensuring an ample, inflation-protected fund for the future.  *Id.* at 591.  Unlike *Amchem*, members

26   of the proposed settlement class in this case "are not divided into conflicting discrete categories,"

27   and there is no similar "allocation dilemma."   *Hanlon*, 150 F.3d at 1020-21.   The class

28   representatives have the same interest as the rest of the class – to receive compensation for having

                                              12

1    to reveal personal identification information in the course of a credit card transaction.  See *Wiener*

2    *v. Dannon Co., Inc.*, 255 F.R.D. 658, 667 (C.D. Cal. 2009) ("As to the first prong of the Ninth

3    Circuit test for the Rule 23(a)(4) adequacy of representation requirement, the Court is not aware

4    of any conflict of interest between Wiener and the proposed class members, as Wiener's interests

5    in proving Dannon's alleged false advertising certainly align with those of other class members.

6    . . . '[Wiener] understands [her] duties and is currently willing and able to perform them.  [Rule

7    23(a)(4)] does not require more,'" quoting *Local Joint Exec. Bd. of Culinary/Bartender Trust*

8    *Fund v. Las Vegas Sands, Inc.*, 244 F.3d 1152, 1162 (9th Cir. 2001)).

9         The court also concludes that class counsel is qualified to handle this type of litigation, and

10   able to prosecute the action vigorously on behalf of the class.  See *Gomez v. Illinois State Bd. of*

11   *Educ.*, 117 F.R.D. 394, 401 (N.D. Ill. 1987) ("Factors involved in an examination of the

12   adequacy of counsel include . . . counsel's experience in handling the type of litigation involved");

13   see also *Esler v. Northrop Corp.*, 86 F.R.D. 20, 37 (W.D. Mo. 1979) ("The central inquiry is

14   whether counsel is experienced with the type of class litigation involved in the case, and generally

15   able to conduct the proposed litigation"); *Carpenter v. Hall*, 311 F.Supp. 1099, 1114 (S.D. Tex.

16   1970) ("By the Plaintiff's attorneys being experienced is meant that he or they are experienced in

17   the type of litigation involved in this cause").  Class counsel proffer evidence that they have

18   extensive experience in class actions, including actions for violation of the Song-Beverly Credit

19   Card Act.[40]  The court therefore finds that counsel are able adequately to protect the interests of

20   all members of the class.  See *Wiener*, 255 F.R.D. at 667-68 ("As to the second prong of the

21   adequacy of representation test, Wiener has retained counsel with significant experience litigating

22   consumer fraud class actions in federal and state courts across the country.  As such, 'Plaintiffs

23

24        [40]Declaration of Gene Stonebarger ("Stonebarger Fees Decl."), Docket No. 36 (Feb. 18,
25   2013), ¶ 10 ("I have extensive experience in complex business litigation and class actions. My
     firm, Stonebarger Law, APC, substantially concentrates its practice in the prosecution of class
26   actions and I have successfully served as Class Counsel or Co-Class Counsel prosecuting
     numerous Class Actions to Judgment against large corporations for violations of California's
27   Song-Beverly Credit Card Act, recovering tens of millions of dollars in benefits for individuals
28   across the country").

are represented by qualified and competent counsel,' satisfying the second prong of the adequacy of representation requirement" quoting *Dukes v. Wal-Mart, Inc.*, 509 F.3d 1168, 1185 (9th Cir. 2007), rev'd on other grounds, *Dukes*, 131 S. Ct. 2541); *True v. American Honda Motor Co.*, 749 F.Supp.2d 1052, 1066 (C.D. Cal. 2010) ("In connection with their motion for preliminary approval, Plaintiffs submitted substantial evidence of class counsel's experience with class action, complex, and other large-scale litigation, including substantial trial experience. . . . Based on the evidence submitted in connection with the motion for preliminary approval, and its own observation of their work throughout the case, the Court concludes Plaintiffs' counsel have made an adequate showing of their qualifications," citing FED.R.CIV.PROC. 23(g)).

### 5.   Conclusion

For the foregoing reasons, the court finds that plaintiffs have satisfied each of the Rule 23(a) requirements for certification of a class.

### B.   Rule 23(b)(3) Requirements

Once the prerequisites of Rule 23(a) are satisfied, one of the criteria set forth in Rule 23(b) must also be met before a class can be certified. *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996) ("In order for a class action to be certified, the plaintiffs must establish the four prerequisites of Fed.R.Civ.P. 23(a) and at least one of the alternative requirements of Fed.R.Civ.P. 23(b)"). Here, the action satisfies Rule 23(b)(3). That rule provides, in pertinent part:

"A class action may be maintained if Rule 23(a) is satisfied and if: . . . (3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include: (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in

14

1    managing a class action." FED.R.CIV.PROC. 23(b)(3).

2    **1.    Predominance of Common Questions**

3    The predominance requirement is "far more demanding" than the commonality requirement

4    of Rule 23(a).   *Amchem Products*, 521 U.S. at 623-24.   If common questions "present a

5    significant aspect of the case and they can be resolved for all members of the class in a single

6    adjudication," then "there is clear justification for handling the dispute on a representative rather

7    than on an individual basis," and the predominance test is satisfied.   *Hanlon*, 150 F.3d at 1022.

8    "'[I]f the main issues in a case require the separate adjudication of each class member's individual

9    claim or defense, [however,] a Rule 23(b)(3) action would be inappropriate.'"   *Zinser v. Accufix*

10   *Research Institute, Inc.*, 253 F.3d 1180, 1190 (9th Cir. 2001) (quoting 7A Charles Alan Wright,

11   Arthur R. Miller & Mary Kay Kane, FEDERAL PRACTICE AND PROCEDURE: CIVIL 2D § 1778, at

12   535-39 (1986)).   This is because, *inter alia*, "the economy and efficiency of class action treatment

13   are lost and the need for judicial supervision and the risk of confusion are magnified."   *Id.*

14   Here, it is clear that common questions of fact and law predominate over issues individual

15   to the class members.   Georgino alleges that Sur la Table has a common policy, the "Information

16   Capture Policy," pursuant to which its cashiers both request and record the personal identification

17   information of retail customers.[41]   The existence of this common policy is at the heart of each class

18   member's claim.   The Song–Beverly Credit Card Act is violated when "a consumer would

19   perceive the store's request for information as a condition of the use of a credit card."   *Florez v.*

20   *Linens 'N Things, Inc.*, 108 Cal.App.4th 447, 451 (2003).   Significantly, the court "applies an

21   objective test to determine whether a retailer's request for personal identification information

22   would be perceived as a condition of credit card payment."   *Yeoman*, 2012 WL 1598051 at *8

23   (citing *Florenz*, 108 Cal.App.4th at 451).   Thus, evidence regarding each specific transaction, to

24   discern the intent of the employee requesting information, is not needed.   As the complaint is

25   framed, questions as to whether, as a common practice, Sur la Table employees requested

26   consumers' personal identification information, utilized common electronic cash registers and

27   _____

28   [41]Complaint, ¶ 2.

15

programs, and recorded information in a common database will predominate over individual issues. Each of these questions can be resolved by the proffer of evidence regarding Sur la Table's policies. See *Yeoman*, 2012 WL 1598051 at *9-10 (through allegations that IKEA had a common policy of recording information using the same system at each store, "[p]laintiff has shown that Ikea has a uniform policy and practice of requesting personal identification information from customers during credit card transactions. Plaintiff has shown that common questions of law and fact predominate over other issues in this case on the grounds that Ikea's uniform policy and practice of requesting personal identification information from customers during credit card transactions can be evaluated to determine if the Song–Beverly Credit Card Act was violated"). Whether or not the Information Capture Policy exists, and whether or not it constitutes a violation of the Song-Beverly Credit Card Act, are questions that will predominate over any individualized issues.

## 2. Superiority

"Under Rule 23(b)(3), the court must evaluate whether a class action is superior by examining four factors: (1) the interest of each class member in individually controlling the prosecution or defense of separate actions; (2) the extent and nature of any litigation concerning the controversy already commenced by or against the class; (3) the desirability of concentrating the litigation of the claims in a particular forum; and (4) the difficulties likely to be encountered in the management of a class action." *Edwards v. City of Long Beach*, 467 F.Supp.2d 986, 992 (C.D. Cal. 2006) (quoting *Leuthold v. Destination Am., Inc.*, 224 F.R.D. 462, 469 (N.D. Cal. 2004)).

Given the limited damages each class member could recover if he or she sued independently, class members' interest in controlling their own cases is minimal. See *True*, 749 F.Supp.2d at 1066 ("Plaintiffs also have shown that a class action is a superior method of resolving this controversy, as each class member has a relatively small and uniform injury, and the costs of litigation would make individual cases impracticable"); *Wiener*, 255 F.R.D. at 672 ("'[A] comparative examination of alternatives underscores the wisdom of a class action in this instance.' '[T]he alternative methods of resolution are individual claims for a small amount of . . .

damages.' . . . '[I]f plaintiffs cannot proceed as a class, . . . most will be unable to proceed as individuals because of the disparity between their litigation costs and what they hope to recover.' Thus, there is no realistic alternative to a class action in this case, making a class action undoubtedly the superior method of adjudication,'" quoting *Hanlon*, 150 F.3d at 1023, and *Las Vegas Sands, Inc.*, 244 F.3d at 1163, and citing *Valentino*, 97 F.3d at 1234). Neither party identifies other pending litigation concerning this controversy; the only known actions are those consolidated in this case. Given that the allegations involve Georgino's purchase of goods at a Sur la Table retail store located in Los Angeles County, within this district, this appears to be the proper forum.[42] While there are several thousand class members, Sur la Table evidently has detailed information concerning them, including mailing addresses and email addresses, making it likely that the case will be manageable. Additionally, any difficulties managing the suit on a classwide basis are offset by the predominance of common issues and impracticability of individual suits. For these reasons, the court concludes that the proposed settlement class satisfies the superiority requirement.

### 3.   Conclusion

Ultimately, the Ninth Circuit has noted that, in considering whether to give final approval to a class settlement, courts should be cognizant of the "strong judicial policy that favors settlements, particularly where complex class action litigation is concerned." *In re Synocor ERISA Litigation*, 516 F.3d 1095, 1101 (9th Cir. 2008); see *id.* ("This policy is also evident in the Federal Rules of Civil Procedure and the Local Rules of the United States District Court, Central District of California, which encourage facilitating the settlement of cases"); *Officers for Justice v. Civil Service Commission*, 688 F.2d 615, 625 (9th Cir. 1982) ("[I]t must not be overlooked that voluntary conciliation and settlement are the preferred means of dispute resolution. This is especially true in complex class action litigation"), cert. denied, 459 U.S. 1217 (1983). Here,

---

[42]*Id.* ¶ 14. Although Dardanian and Peterson both filed their actions in the Northern District of California, both stipulated to the transfer of their action to the Central District of California. They, like Georgino, sought to represent a California-wide class of Sur la Table credit card purchasers.

1    viewing the Rule 23 requirements through the prism of certifying a settlement class, the court

2    concludes that the prerequisites for class certification under Rules 23(a) and 23(b)(3) are satisfied.

3    **C.    Final Approval of the Proposed Class Action Settlement**

4    Rule 23(e)(1)(A) requires that the court "approve any settlement, voluntary dismissal, or

5    compromise of the claims, issues, or defenses of a certified class."  Approval under Rule 23(e)

6    involves a two-step process "in which the [c]ourt first determines whether a proposed class action

7    settlement deserves preliminary approval and then, after notice is given to class members, whether

8    final approval is warranted."  *National Rural Telecommunications Cooperative v. DIRECTV, Inc.*

9    *("NRTC")*, 221 F.R.D. 523, 525 (C.D. Cal. 2004) (citing MANUAL FOR COMPLEX LITIGATION,

10   THIRD, § 30.14, at 236-37 (1995)).

11   **1.    Notice Requirements**

12   Rule 23(e) requires that "notice of the proposed dismissal or compromise [of a class action]

13   shall be given to all members of the class in such manner as the court directs."  FED.R.CIV.PROC.

14   23(e).  The notice given must be "reasonably calculated, under all the circumstances, to apprise

15   interested parties of the pendency of the action and afford them an opportunity to present their

16   objections."  *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950); see also

17   *Mandujano v. Basic Vegetable Products, Inc.*, 541 F.2d 832, 835 (9th Cir. 1976) ("To comply

18   with the spirit of [Rule 23(e)], it is necessary that the notice be given in a form and manner that

19   does not systematically leave an identifiable group without notice").

20   As noted, Sur la Table provided four types of notice to class members: (1) it emailed

21   individuals for whom it had an email address; (2) it ran a search of the National Change of

22   Address Database to determine the current mailing address of each class member for whom it had

23   an address and mailed notice to that address; (3) it posted an in-store notice at the point of sale in

24   each Sur la Table store in California; and (4) paid for the settlement administrator to establish a

25   website where class members could access all the relevant notices and forms.

26   The court approved giving notice in this fashion in its order granting preliminary approval

27   of the settlement, and it is satisfied that Sur la Table's efforts were effective to provide notice of

28   the settlement to potential class members.  The parties not only mailed notice to a complete list

18

of known class members, but also worked to verify current address information to assure that each

class member received notice.  Sur la Table also funded the establishment of a website where

information concerning the terms of the settlement, the procedure for filing objections to the

settlement, and the procedure for opting out of the agreement was available; it also caused the

settlement administrator to establish a physical mailing address where class members who desired

additional information regarding the settlement could mail questions.  Consequently, the court

finds that unnamed class members had adequate notice of the settlement and adequate opportunity

to file a valid claim form, to opt out, or to object to the settlement.  See e.g. *Bruno v. Quten

Research Institute, LLC*, No. SACV 11–00173 DOC (Ex), 2013 WL 990495, *1 (C.D. Cal. Mar.

13, 2013) (concluding that adequate notice had been given where "[t]he parties sent notice to

members of the settlement class through the court-approved notice plan (which included internet

advertisements, emails, first class mail to class members whose address was known), and a

settlement website").  The court concludes, therefore, that the notice requirement of Rule 23(e)

has been met.

### 2.    Fairness of the Proposed Settlement

"The role of a court . . . reviewing the proposed settlement of a class action under

Fed.R.Civ.P. 23(e) is to assure that the procedures followed meet the requirements of the rule and

comport with due process and to examine the settlement for fairness and adequacy." *Vaughns v.

Board of Education of Prince George's County*, 18 F.Supp.2d 569, 578 (D. Md. 1998).  The

district court's role, in reviewing "what is otherwise a private consensual agreement negotiated

between the parties to a lawsuit, must be limited to the extent necessary to reach a reasoned

judgment that the agreement is not the product of fraud or overreaching by, or collusion between,

the negotiating parties, and that the settlement, taken as a whole, is fair, reasonable and adequate

to all concerned." *Officers for Justice*, 688 F.2d at 625.

The parties contend that the settlement is presumptively fair because it is the result of good

faith, arms-length negotiations.[43]  See *NRTC*, 221 F.R.D. at 528 ("A settlement following

---

[43]Approval Motion at 10.

sufficient discovery and genuine arms-length negotiation is presumed fair," citing *City Partnership Co. v. Atlantic Acquisition Ltd, P'ship*, 100 F.3d 1041, 1043 (1st Cir. 1996)).   The parties' settlement in this case was the result of a mediation held before an experienced class action mediator.[44]  The mediation occurred only after the parties had conducted extensive discovery.[45] Thus, the agreement was reached in good faith after a well-informed arms-length negotiation and is entitled to a presumption of fairness.  Nonetheless, the court must examine the settlement terms and consider relevant factors to determine whether the settlement is truly fair.

In making this assessment, the court balances:

"(1) the strength of the plaintiffs' case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of the class members to the proposed settlement."  *Churchill Village, L.L.C. v. General Electric*, 361 F.3d 566, 575 (9th Cir. 2004) (citing *Hanlon*, 150 F.3d at 1026).

This list of factors is not exclusive, "and different factors may predominate in different factual contexts."  *Torrisi v. Tuscon Electric Power Co.*, 8 F.3d 1370, 1376 (9th Cir. 1993).  See also *Churchill Village*, 361 F.3d at 576 n. 7 ("Because the settlement evaluation factors are non-exclusive, discussion of those factors not relevant to this case has been omitted"); *Young v. Polo Retail, LLC* ("*Young II*"), No. C-02-4546 VRW, 2007 WL 951821, *3 (N.D. Cal. Mar. 28, 2007) (adding as relevant factors "(9) the procedure by which the settlements were arrived at, see MANUAL FOR COMPLEX LITIGATION (FOURTH) § 21.6 (2004), and (10) the role taken by the plaintiff in that process").

Recently, the Ninth Circuit clarified that "[p]rior to formal class certification, there is an even greater potential for a breach of fiduciary duty owed the class during settlement.

[44]*Id.* at 2.

[45]*Id.*

20

Accordingly, such agreements must withstand an even higher level of scrutiny for evidence of collusion or other conflicts of interest than is ordinarily required under Rule 23(e) before securing the court's approval as fair." *In re Bluetooth Headset Products Liability Litigation*, 654 F.3d 935, 946 (9th Cir. 2011). Since "[c]ollusion may not always be evident on the face of a settlement . . . courts . . . must be particularly vigilant not only for explicit collusion, but also for more subtle signs that class counsel have allowed pursuit of their own self-interests and that of certain class members to infect the negotiations." *Id.* at 947. The *Bluetooth* court identified a number of potential "red flags" that should give a district court pause before approving a class settlement. These factors are addressed below.

### a.   Strength of Plaintiffs' Case

Plaintiffs acknowledge that there were substantial obstacles to prevailing on their claim.[46] They note, for example, that the theory of their case is that "requesting and recording a cardholder's [personal identification information], *without more*, violates Section 1747.08," and that a retailer cannot request such information from a customer paying by credit card "even if the consumer's response was voluntary and made only for marketing purposes."[47] Sur la Table, by contrast, asserts that its sales associates requested and recorded a customer's personal identification, regardless of the form of tender, only after the customer voluntarily asked to be placed on Sur la Table's mailing list; it contends the voluntary nature of the transactions places them outside the scope of activity prohibited by the Song-Beverly Credit Card Act.[48] The Act prohibits requests for information if the request "preceded the credit card transaction, even if the consumer's response was voluntary and made only for marketing purposes." *Florez*, 108 Cal.App.4th at 470. "[N]othing [in the act] prevents a retailer from soliciting a consumer's address and telephone number for a store's mailing list, [however,] if that information is provided voluntarily," so long as the request is made after the customer "makes his or her preferred method

---

[46]*Id.* at 11.

[47]*Id.*

[48]*Id.*

of payment known." *Id.* at 451.  Thus, if Sur la Table were able to prove at trial that its Information Capture Policy provides that sales associates were not to ask for personal information until after the customer identified his or her form of tender, and not unless the customer voluntarily asked to be placed on the mailing list, its policy would likely not violate the Act.  The fact that this issue, which is at the heart of plaintiffs' case, is a subject of serious dispute favors a finding that the settlement is fair.  See *In re Portal Software, Inc. Securities Litigation*, No. C-03-5138 VRW, 2007 WL 4171201, *3 (N.D. Cal. Nov. 26, 2007) ("Factor (1), the strength of plaintiffs' case, somewhat favors settlement because plaintiffs' remaining claims are tenuous. Plaintiffs assert that establishing liability and damages at trial would be difficult because of the uncertainties associated with proving its claims, which are 'exacerbated by the unpredictability of a lengthy and complex jury trial'").  Given the uncertainty that the class would ultimately have prevailed, the court finds that this factor weighs in favor of final approval of the settlement.

> **b.** **The Risk, Expense, Complexity, and Likely Duration of Further Litigation**

In addition to the risks inherent in the litigation, the parties also faced the prospect of significant litigation expense and the possibility that the case would not be resolved for several years.  Class certification motions would have been hotly litigated, and Sur la Table expressed an intent to file a motion for summary judgment prior to the date the settlement agreement was finalized.[49]  Preparing the motions and opposition would have been consumed significant time and money.  It is likely, moreover, that, "[r]egardless of how this Court might have ruled on the merits of the legal issues, the losing party likely would have appealed, and the parties would have faced the expense and uncertainty of litigating an appeal."  *Glass v. UBS Financial Services, Inc.*, No. C-06-4068 MMC, 2007 WL 221862, *4 (N.D. Cal. Jan. 26, 2007).  Even at this relatively early stage in the  case, plaintiffs' counsel report that they have expended almost 500 hours

---

[49]Joint Rule 26(f) Report, Docket No. 12 (Sept. 26, 2011) at 6.

1    working on the case, and have incurred costs of more than $13,000.[50]  The court thus concludes

2    that the parties faced substantial expense had this case been litigated to conclusion.  See *Officers*

3    *for Justice*, 688 F.2d at 626; *Milstein v. Huck*, 600 F.Supp. 254, 267 (E.D.N.Y. 1984) ("The

4    expense and possible duration of the litigation are major factors to be considered in evaluating the

5    reasonableness of this settlement"); *Sandoval v. Tharaldson Employee Management*, No. EDCV

6    08-00482 VAP (OPx), 2009 WL 3877203, *6 (C.D. Cal. Nov. 17, 2009) ("Settling the case,

7    Plaintiff reasons, would 'avoid many more documents being requested, reviewed and analyzed

8    with more expense in having [Plaintiff's] expert analyze the documents[,] . . . obtain[ing] the

9    contact information of the absent class members, contact[ing] them and obtain[ing] numerous

10   declarations[,] . . . [and] send[ing] out questionnaires to absent members at great expense'").

11        Because both plaintiffs and Sur la Table would have had to engage in extensive, expensive

12   motion practice, discovery, and pretrial activities, and because both sides faced the prospect of

13   not prevailing, this factor supports approval of the settlement.

14                          c.      **The Risk of Maintaining Class Action Status Throughout Trial**

15        Whether or not the action would have been tried as a class action is also relevant in

16   assessing the fairness of the settlement.  As the court had not yet certified a class at the time the

17   settlement agreement was executed, it was unclear whether or not certification would have been

18   granted.  Sur la Table notes that it intended to oppose plaintiffs' certification motion, and "would

19   surely [have] challenge[d] class certification on appeal" in the event of an adverse judgment.  See

20   *Rodriguez v. West Pub. Corp.*, No. CV05-3222, 2007 WL 2827379, *8 (C.D. Cal. Sept. 10,

21   2007) (finding that the likelihood that a certification decision would be appealed meant this factor

22   weighed in favor of approval), rev'd on other grounds, 563 F.3d 948 (9th Cir. 2009).  This

23   litigation activity would, as noted, have required that the parties expend significant resources.

24   This factor, therefore, weighs in favor of approving the proposed settlement.

25

26

27        [50]Stonebarger Fees Decl., ¶ 6; Declaration of James Patterson ("Patterson Fees Decl."),
     Docket No. 36 (Feb. 18, 2013), ¶ 6; Declaration of Tim Hoffman ("Hoffman Fees Decl."),
28   Docket No. 36 (Feb. 18, 2013), ¶ 6; Fees Motion at 15.

d.    **The Amount Offered in Settlement**

As the Ninth Circuit has noted, "it is the very uncertainty of outcome in litigation and avoidance of wasteful and expensive litigation that induce consensual settlements.  The proposed settlement is [thus] not to be judged against a hypothetical or speculative measure of what *might* have been achieved by the negotiators." *Officers for Justice*, 688 F.2d at 625 (emphasis original). Rather, "the very essence of a settlement is compromise, 'a yielding of absolutes and an abandoning of highest hopes.'" *Id.* at 624 (quoting *Cotton v. Hinton*, 559 F.2d 1326, 1330 5th Cir. 1977)).  "'The fact that a proposed settlement may only amount to a fraction of the potential recovery does not, in and of itself, mean that the proposed settlement is grossly inadequate and should be disapproved.'" *Linney v. Cellular Alaska Partnership*, 151 F.3d 1234, 1242 (9th Cir. 1998) (quoting *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 455 & n. 2 (2d Cir. 1974)). Estimates of what constitutes a fair settlement figure are tempered by factors such as the risk of losing at trial, the expense of litigating the case, and the expected delay in recovery (often measured in years).

The proposed settlement in this case awards each class member a transferrable $13 merchandise certificate for use at a Sur la Table store.[51]  While the certificates have a cash value, they are a form of non-monetary relief and must be carefully scrutinized.  See FED.R.CIV.PROC. 23(2)(C)(h), Advisory Committee Note ("Settlements involving nonmonetary provisions for class members . . . deserve careful scrutiny to ensure that these provisions have actual value to the class").   Other courts have approved the use of gift cards or coupons in lieu of monetary compensation in the class action context.  See *Young II*, 2007 WL 951821 at *4 (approving the use of gift cards in large part because they are transferrable; "this enables class members to obtain cash - something all class members will find useful"); *States of New York and Maryland v. Nintendo of America, Inc.*, 775 F.Supp. 676, 681 (S.D.N.Y.1991) (approving a settlement awarding each class member a five dollar coupon and noting that the coupons were fully transferrable and that "[c]ompensation in the form of coupons has been approved by other

---

[51]Motion at 13.

1    courts").

2        The parties, however, do not provide any argument or evidence regarding the total liability

3    Sur la Table faced if this case proceeded to trial.  Section 1474.08 provides a civil penalty "not

4    to exceed two hundred fifty dollars ($250) for the first violation and one thousand dollars ($1,000)

5    for each subsequent violation."  CAL. CIV. CODE § 1747.08.  The amount of penalty imposed

6    under § 1747.08 rests "within the sound discretion of the trial court."  *TJX Companies, Inc. v.*

7    *Superior Court*, 163 Cal.App.4th 80, 85 (2008).  The amount awarded can "span between a penny

8    (or even the proverbial peppercorn we all encountered in law school) to the maximum amounts

9    authorized by the statute."  *Id*. at 86; see also *Linder v. Thrifty Oil Co.* (2000) 23 Cal.4th 429,

10   448 (2000) (holding that § 1747.08 "does not mandate fixed penalties; rather, it sets maximum

11   penalties of $250 for the first violation and $1,000 for each subsequent violation").

12       If each class member were individually to litigate his or her claim, he or she could each

13   receive as much as $1,000, provided they are not the first plaintiff to bring an action against Sur

14   la Table.  Against a recovery of this amount, a $13 award represents only 0.13% of each class

15   member's possible recovery.  If the benchmark were a $1,000 award, the comparable *de minimus*

16   amount of the settlement would weigh against approval.  There is no indication that, in the class

17   action context, a court would award the maximum penalty to each class member, however.  If

18   each class member were awarded only $100, as an example, the $13 settlement certificate would

19   represent an award of 13% of the total possible penalty, and this factor would weigh in favor of

20   approval.  See, e.g., *In re Mego Financial Corp. Securities Litigation*, 213 F.3d 454, 459 (9th

21   Cir. 2000) (holding that, given the difficulties inherent in complex litigation, a settlement that paid

22   plaintiffs one-sixth of their potential recovery was fair and adequate); *Jaffe v. Morgan Stanley &*

23   *Co.*, No. C 06-3903 TEH, 2008 WL 346417, *9 (N.D. Cal. Feb. 7, 2008) ("The settlement

24   amount could undoubtedly be greater, but it is not obviously deficient, and a sizeable discount is

25   to be expected in exchange for avoiding the uncertainties, risks, and costs that come with litigating

26   a case to trial").

27       Additionally, certificates have already been mailed to class members; they need not wait

28   years to receive the benefits of the settlement.  The amount of compensation each class member

1    will receive, while small, represents a compromise of disputed claims reached following extensive

2    arms-length negotiations.   Given the absence of any allegations of actual harm suffered by class

3    members, and the expense of bringing tens of thousands of individual claims, the compensation

4    provided by the settlement does not appear disproportionately small.   Consequently, the court

5    finds that the settlement amount is fair and adequate, and will provide immediate monetary relief

6    to the class.  See *Linney*, 151 F.3d at 1242 ("[T]he very essence of a settlement is compromise,

7    a yielding of absolutes and an abandoning of highest hopes" in favor of an immediate return).

8                    **e.        The Stage of the Proceedings and Extent of Discovery Completed**

9            "'The extent of discovery may be relevant in determining the adequacy of the parties'

10   knowledge of the case.'"   *NRTC*, 221 F.R.D. at 527 (quoting MANUAL FOR COMPLEX

11   LITIGATION, THIRD, § 30.42 (1995)).   "'A court is more likely to approve a settlement if most of

12   the discovery is completed because it suggests that the parties arrived at a compromise based on

13   a full understanding of the legal and factual issues surrounding the case.'"   *Id*. (quoting 5 W.

14   Moore, MOORE'S FEDERAL PRACTICE, § 23.85[2][e] (Matthew Bender 3d ed.)).   The greater the

15   amount of discovery that has been completed, the more the parties have "a clear view of the

16   strengths and weaknesses of their cases.'"   *Young II*, 2007 WL 951821 at *4 (quoting *In re

17   Warner Communications Sec. Litig.*, 618 F.Supp. 735, 745 (S.D.N.Y. 1985)).

18           The parties engaged in settlement negotiations relatively early in the litigation.  Plaintiffs'

19   counsel asserts, however, that prior to mediating, the parties had "exchang[ed] substantial formal

20   discovery as to the scope of the class, the number of transactions at issue, and the merits of the

21   claims."[52]  Counsel have adduced evidence that they spent roughly 50 hours reviewing documents

22   produced by Sur la Table prior to the mediation.[53]   Given the relatively confined nature of the

23   class claim, the court concludes that the parties had sufficient information to make an informed

24   _____

25           [52]Stonebarger Decl., ¶ 3.  See also Hoffman Fees Decl., ¶ 3 ("After taking into account
     the factual information learned through discovery, my firm, along with other Plaintiffs' Counsel,
26   and Sur La Table Inc.'s Counsel, engaged in extensive arms-length settlement negotiations,
27   including participating in an all-day Mediation session before the Michael Dickstein").

28           [53]Stonebarger Fees Decl., ¶ 6; Patterson Fees Decl., ¶ 6.

1 decision about the adequacy of the settlement, and that this factor weighs in favor of approval of
2 the parties' agreement.

### f.    The Presence of a Governmental Participant

4 This factor does not apply because no government entity participated in the case.

### g.    The Experience and Views of Counsel

6 "The recommendations of plaintiffs' counsel should be given a presumption of
7 reasonableness." *Boyd v. Bechtel Corp.*, 485 F.Supp. 610, 622 (N.D. Cal. 1979) (citations
8 omitted). "Parties represented by competent counsel are better positioned than courts to produce
9 a settlement that fairly reflects each party's expected outcome in litigation." *In re Pacific
10 Enterprises Securities Litigation*, 47 F.3d 373, 378 (9th Cir. 1995). Here, the class is represented
11 by competent attorneys, and lead counsel has submitted a declaration stating that he believes the
12 settlement is in the best interests of the class.[54] He asserts that the "settlement set forth in the
13 Settlement Agreement confers substantial benefits upon the Class Members, and is a fair,
14 reasonable and adequate resolution of the Class claims against [Sur la Table]."[55] Furthermore,
15 counsel is experienced in litigating complex class actions, including actions asserting claims under
16 the Song-Beverly Credit Card Act.[56] As a consequence, the court concludes that this factor weighs
17 in favor of approving the settlement, although counsel's recommendation must be discounted
18 somewhat due to their obvious pecuniary interest in having the settlement approved. See *Young
19 II*, 2007 WL 951821 at *5; see also *Fernandez v. Victoria Secret Stories*, No. CV 06-04149
20 MMM (SHx), 2008 WL 8150856, *7 n. 32 (C.D. Cal. July 21, 2008) ("While the court agrees
21 that this factor must be discounted to some degree in recognition of the personal interest of class
22 counsel in having the settlement approved, it declines to discount the well-considered views of
23 counsel entirely").

### h.    Class Members' Reaction to the Proposed Settlement

[54]Stonebarger Decl., ¶ 6.

[55]*Id.*

[56]Stonebarger Fees Decl., ¶ 10.

27

To gauge the reaction of class members under the eighth factor, it is appropriate to evaluate the number of requests for exclusion, as well as the objections submitted.  See *In re General Motors Corp. Pick-Up Truck Fuel Tank Prods. Liability Litig.*, 55 F.3d 768, 812 (3d Cir.1995) ("In an effort to measure the class's own reaction to the settlement's terms directly, courts look to the number and vociferousness of the objectors," quoting *Pallas v. Pacific Bell*, No. C-89-2373 DLJ, 1999 WL 1209495, *6 (N.D. Cal. July 13, 1999) ("The greater the number of objectors, the heavier the burden on the proponents of settlement to prove fairness")).

Over 98,000 class members received notice of this action; only two individuals have opted out of the settlement, and no class member has objected to the fairness of the settlement.[57]  The extremely low number of opt-outs – 0.002% of the class – and the absence of objections indicate that class members overwhelmingly favor the proposed settlement and find it fair.  See *Garner v. State Farm Mut. Auto. Ins.,* No. CV 08 1365 CW (EMC), 2010 WL 1687832, *15 (N.D. Cal. Apr. 22, 2010) (finding that an opt-out rate of 0.4 percent supported "the fairness of the Settlement"); *Mangone v. First USA Bank*, 206 F.R.D. 222, 227 (S.D. Ill. 2001) (an opt-out rate of 0.10614 percent and an objection rate of 0.0052 percent represented "overwhelming support" for a settlement by class members and constituted "strong circumstantial evidence supporting the fairness of the Settlement"); see also *Churchill Village*, 361 F.3d at 577 (affirming approval of a class action settlement where 90,000 class members received notice, and 45 objections were received); *In re Austrian and German Bank Holocaust Litig.*, 80 F.Supp.2d 164, 175 (S.D.N.Y. 2000) (finding a small number of objectors "indicative of the adequacy of the settlement").

### i.    Other Factors

As noted, the *Young II* court considered two additional factors: the process by which settlement was reached and the involvement of the named plaintiff in the process.  The parties in this case reached agreement after intensive arms-length negotiations facilitated by a neutral mediator.[58]  Class counsel notes that each plaintiff "actively participated in litigation," including

---

[57]Hamer Decl., ¶ 7.

[58]Approval Motion at 15.

1 "participating in interviews, meeting and telephone consultations;" "spending numerous hours
2 gathering information;" and helping counsel "prepare the complain, for mediation, and the
3 briefing related to approval of the settlement."[59]  Both of these additional factors, therefore, weigh
4 in favor of approving the settlement.

5                              **j.     Signs of Collusion**

6        The Ninth Circuit has explained that, in addition to evaluating the fairness of the settlement
7 terms, the district court should be watchful for "subtle signs" that class counsel and the class
8 representatives have permitted self-interest to outweigh their obligation to ensure a fair settlement
9 for the class as a whole.  *In re Bluetooth*, 654 F.3d at 947. In *Bluetooth*, the Ninth Circuit
10 identified three possible signs of such collusion:

11        "(1) when the settlement terms result in class counsel receiving a disproportionate
12        share of the settlement, or when the class receives no monetary compensation but
13        counsel receive an ample award of attorneys' fees;

14        (2) the presence of a clear sailing agreement that carries the potential of enabling
15        a defendant to pay class counsel excessive fees and costs in exchange for . . .
16        accepting an unfair settlement; and

17        3) when the parties arrange for fees not awarded to revert to defendants, rather than
18        being paid into the class fund." *Id.* (citations and quotation marks omitted).

19 The Ninth Circuit noted that this list was not exclusive, but felt that it offered some guidance to
20 lower courts regarding the type of provisions that require "greater scrutiny than ordinarily
21 demanded" as to the overall fairness of the settlement.  *Id.* at 949.

22        The second and third signs of collusion noted in *Bluetooth* are present here to an extent.[60]

23

24 ─────────────────
        [59]Stonebarger Fees Decl., ¶ 4.
25
        [60]The first sign of collusion is largely absent.  The attorneys' fees sought are not nearly as
26 disproportionate as was the fee award at issue in *In re Bluetooth*.  There, "the amount awarded
   was 83.2% of the total amount defendants were willing to spend to settle the case." *Id.* at 945.
27 The agreement here specifies that defendants will not object to an attorneys' fee award of
   $425,000, which amounts to roughly 25% of the gross settlement fund.  (Settlement Agreement
28

First, the parties' settlement agreement contains an explicit "clear sailing" provision. "In general, a clear sailing agreement is one where the party paying the fee agrees not to contest the amount to be awarded by the fee-setting court so long as the award falls beneath a negotiated ceiling." *Weinberger v. Great Northern Nekoosa Corp.*, 925 F.2d 518, 520 n. 1 (1st Cir. 1991).  The parties' agreement states: "Class Counsel will apply to the Court for a total award of $425,000 as their Class Counsel Fees and Litigation Expense Payment.  [Sur la Table] will not oppose this request.  If the Court approves Class Counsel Fees and Litigation Expense Payment of less than $425,000, the remainder will be retained by [Sur la Table]."[61]

Clear sailing provisions are troubling on several levels.  "[T]he very existence of a clear sailing provision increases the likelihood that class counsel will have bargained away something of value to the class."  *In re Bluetooth*, 654 F.3d  at 948 (citation omitted); *see also Malchman v. Davis*, 761 F.2d 893, 908 (2d Cir. 1985) (Newman, J., concurring) ("It is unlikely that a defendant will gratuitously accede to the plaintiffs' request for a 'clear sailing' clause without obtaining something in return.  That something will normally be at the expense of the plaintiff class"), abrogated on other grounds in *Amchem*, 521 U.S. at 619.  "Such a clause deprives the court of the advantages of the adversary process.  The source of the proposed payment renders it improbable that class members will come forward to challenge the reasonableness of the requested fee.  Meanwhile, the payor is bound by contract not to contest the application." *Weinberger*, 925 F.2d at 525.  The Ninth Circuit has noted, moreover, that the inference of collusion drawn from a clear sailing provision is greater when the agreement contains a reversionary or "kicker provision" – the third sign of collusion the *Bluetooth* court identified.

---

at 5.)  This leaves a net settlement amount for class members of $ $1,282,463, which is significantly larger than the amount that the agreement contemplates class counsel will receive.  Thus, this is not an situation in which the fee award is so disproportionate that it suggests collusion.  Compare *Harris v. Vector Marketing Corp.*, No. C–08–5198 EMC, 2011 WL 4831157, *6 (N.D. Cal. Oct. 12, 2011) (rejecting a class settlement in which "class counsel [sought] an unopposed award roughly four times greater than the actual and expected payout to the class (approximately $4 million compared to approximately $1 million)").

[61]Settlement Agreement at 5.

*In re Bluetooth*, 654 F.3d at 949 ("For this same reason, a kicker arrangement reverting unpaid attorneys' fees to the defendant rather than to the class amplifies the danger of collusion already suggested by a clear sailing provision. . . .   The clear sailing provision reveals the defendant's willingness to pay, but the kicker deprives the class of that full potential benefit if class counsel negotiates too much for its fees").   The parties' settlement agreement unambiguously provides that any unpaid attorneys' fees will revert to Sur la Table, and will not be paid to the class.

        Nonetheless, and despite the clear sailing and kicker provisions, the class stands to receive a sufficiently large award that these indications of collusion do not warrant invalidating the agreement as a whole.   The Ninth Circuit has stated that such signs merely render it "less likely that the settlement can be approved if the district court determines that the clear sailing provision authorized *unreasonably high attorneys' fees*."   *Id*. (emphasis added).   It further noted that, in the presence of such warning signs, the court must only approve a settlement if it was "supported by a clear explanation of why the *disproportionate fee* is justified and does not betray the class's interests."   *Id*. (emphasis added).

        As discussed in detail below, the court does not find the requested fees to be unreasonably high or disproportionate to the class recovery.   This is not, moreover, a case in which Sur la Table has agreed to pay a lump sum that will be apportioned among class members and attorneys.   Rather, the settlement agreement provides that each class member will be receive a $13 merchandise certificate; the parties derive the total value of the compensation to be paid to the class by multiplying $13 by the number of class members.   The $425,000 attorneys' fees payment is separate and is not deducted from the calculated class recovery.   See *Shames v. Hertz Corp.*, No. 07–CV–2174–MMA (WMC), 2012 WL 5392159, *14 (S.D. Cal. Nov. 5, 2012) (in a settlement pursuant to which class members could choose between a voucher for a free car rental or a monetary payment of $2 per each day the member rented a car, the court determined that "the attorneys' fees . . . are wholly separate from the class settlement – and will have no impact one way or the other on the amount the class recovers – a 'savings' for Defendants does not implicate the concerns the Ninth Circuit expressed about the 'kicker' provision in the *Bluetooth* settlement").   While it is certainly possible that the $13 per class member figure was determined,

31

1   in part, with reference to the amount Sur la Table was going to have to pay class counsel, the  fact

2   that the settlement does not contemplate a common fund from which both class members and

3   counsel will be paid mitigates, to some extent, the collusive nature of the kicker provision.

4        Furthermore, the fact that the agreement was reached after a full-day mediation before an

5   experienced, neutral supports the conclusion that the settlement was not the result of collusion,

6   but rather good-faith negotiation.  See *Wren v. RGIS Inventory Specialists*, No. C–06–05778 JCS,

7   2011 WL 1230826, *14 (N.D. Cal. Apr. 1, 2011) ("[T]he Settlement Agreement is the result of

8   arms-length negotiations supervised by Judge Infante.  This supports a finding that the parties

9   reached the settlement in a procedurally sound manner and that it was not the result of collusion

10  or bad faith by the parties or counsel"); *Satchell v. Fed. Exp. Corp.*, No. C 03–2659 SI, 2007 WL

11  1114010, *4 (N.D.Cal. Apr.13, 2007) ("The assistance of an experienced mediator in the

12  settlement process confirms that the settlement is non-collusive").

13       Ultimately, although there are signs of possible collusion, the other factors favoring

14  approval, and the participation of a neutral mediator in the settlement process cause the court to

15  conclude that there is insufficient evidence of collusion to warrant denial of the final approval

16  motion.  The court will consider the signs of collusion, however, in evaluating the reasonableness

17  of counsel's request for attorneys' fees.

18            **k.    Balancing the Factors**

19       "Ultimately, the district court's determination [of fairness and adequacy] is nothing more

20  than an amalgam of delicate balancing, gross approximations and rough justice."  *Officers for*

21  *Justice*, 688 F.2d at 625 (citation omitted).  "[I]t must not be overlooked that voluntary

22  conciliation and settlement are the preferred means of dispute resolution.  This is especially true

23  in complex class action litigation."  *Id*.  Having considered the relevant factors, the court

24  concludes that the circumstances surrounding the settlement weigh in favor of approval.

25  Accordingly, it finds that the proposed settlement is fair and adequate, and approves it.

26       **D.    Attorneys' Fees**

27       In "common-fund" cases such as this one, "where the settlement or award creates a large

28  fund for distribution to the class, the district court has discretion to use either a percentage or

lodestar method." *Hanlon*, 150 F.3d at 1029 (citing *In re Washington Public Power Supply System Sec. Litig.*("*WPPSS*"), 19 F.3d 1291, 1295 (9th Cir. 1994)).  Whether a court applies the lodestar or percentage method, the Ninth Circuit "'require[s] only that fee awards in common fund cases be *reasonable* under the circumstances.'"  *WPPSS*, 19 F.3d at 1295 n. 2 (quoting *Florida v. Dunne*, 915 F.2d 542, 545 (9th Cir. 1990) (emphasis original)).

The lodestar figure is "the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate."  *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983).  The lodestar "presumptively provides an accurate measure of reasonable attorney's fees."  See *Harris v. Marhoefer*, 24 F.3d 16, 18 (9th Cir. 1994); *Clark v. City of Los Angeles*, 803 F.2d 987, 990 (9th Cir. 1986).  A court may increase or decrease the lodestar amount in rare or exceptional cases.  See *Blum v. Stenson*, 465 U.S. 886, 898-901 (1984); *Harris*, 24 F.3d at 18; *Clark*, 803 F.2d at 990-91.

A court employing this method to determine the amount of an attorneys' fees award does not directly consider the multi-factor test developed in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974), and *Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67, 69-70 (9th Cir. 1975).[62]  Rather, as a first step, it determines the lodestar amount, which subsumes certain of the *Kerr/Johnson* factors, i.e., the novelty and complexity of the issues, the special skill and experience of counsel, the quality of the representation, and the results obtained.  See *Blum*, 465 U.S. at 898-900; *Clark*, 803 F.2d at 990-91 & n. 3; *Cunningham v. County of Los Angeles*, 879 F.2d 481, 484 (9th Cir. 1988).  Next, the court looks to the *Johnson/Kerr* factors that have not been subsumed in the lodestar calculation to determine whether to increase or reduce the

---

[62]Under the *Johnson/Kerr* test, the factors to consider in determining the amount of attorney's fees awarded include: "(1) the time and labor required, (2) the novelty and difficulty of the questions involved, (3) the skill requisite to perform the legal service properly, (4) the preclusion of other employment by the attorney due to acceptance of the case, (5) the customary fee, (6) whether the fee is fixed or contingent, (7) time limitations imposed by the client or the circumstances, (8) the amount involved and the results obtained, (9) the experience, reputation, and ability of the attorneys, (10) the 'undesirability' of the case, (11) the nature and length of the professional relationship with the client, and (12) awards in similar cases."  *Kerr*, 526 F.2d at 70; see also *Johnson*, 488 F.2d at 717-19.

presumptively reasonable lodestar fee.  See *Clark*, 803 F.2d at 991.

The Ninth Circuit has established 25% of the common fund as a benchmark to use in awarding fees under the the percentage-of-fund method.  See *Fischel v. Equitable Life Assurance Society of U.S.*, 307 F.3d 997, 1006 (9th Cir. 2002); *Six (6) Mexican Workers v. Arizona Citrus Growers*, 904 F.2d 101, 1311 (9th Cir. 1990).  "The benchmark percentage should be adjusted, or replaced by a lodestar calculation, [however,] when special circumstances indicate that the percentage recovery would be either too small or too large in light of the hours devoted to the case or other relevant factors."  *Six (6) Mexican Workers*, 904 F.2d at 1311.  In evaluating the reasonableness of the fee award, the court must take into account all the circumstances of the case. *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1048 (9th Cir.), cert. denied *sub nom. Vizcaino v. Waite*, 537 U.S. 1018 (2002).

In *Dunne*, 915 F.2d 542, where the appellate court approved the district court's use of the lodestar method to award fees in a common fund case, the Ninth Circuit explained:

"Despite the recent ground swell of support for mandating a percentage-of-the-fund approach in common fund cases, . . . we require only that fee awards in common fund cases be reasonable under the circumstances.  Accordingly, either the lodestar or the percentage-of-the-fund approach 'may, depending upon the circumstances, have its place in determining what would be reasonable compensation for creating a common fund.'"  See *id*. at 545 (quoting *Paul, Johnson, Alston & Hunt v. Graulty*, 886 F.2d 268, 272 (9th Cir. 1989)).

In cases where courts apply the percentage method to calculate fees, they generally use a rough calculation of the lodestar as a cross-check to assess the reasonableness of the percentage award.  See *Vizcaino*, 290 F.3d at 1050 ("Calculation of the lodestar, which measures the lawyers' investment of time in the litigation, provides a check on the reasonableness of the percentage award").[63]  By the same token, "a court applying the lodestar method to determine

---

[63]In *Young II*, Judge Walker explored the utility of using the lodestar method as a check when awarding fees based on a percentage of the common fund.  He stated:

"Indeed, the court's independent research into fee award practice in other courts

attorney's fees may use the percentage-of-the-fund analysis as a cross-check." *Grays Harbor Adventist Christian School v. Carrier Corp.*, No. 05-05437 RBL, 2008 WL 1901988, *5 (W.D. Wash. Apr. 24, 2008) (citing *Wing v. Asarco Inc.*, 114 F.3d 986, 988-90 (9th Cir. 1994)).

---

convinces it that the best practice is to assess a percentage fee award not only by using the usual litany of factors bearing on the reasonableness of a fee [citing *Vizcaino*], but also by cross-checking the percentage fee award against a rough fee computation under the lodestar method. See, e.g., *In re GMC Pick-Up Tuck Fuel Tank Prods. Liability Litig.*, 55 F.3d 768, 820-21 & n. 40 (3d Cir. 1995) (Becker, J). See also *Vizcaino*, 290 F.3d at 1050-51 (approving district court's use of a lodestar cross-check); *In re HPL Techs., Inc., Sec Litig.*, 366 F.Supp.2d 912 (N.D. Cal. 2005).

In contrast to the use of the lodestar method as a primary tool for setting a fee award, the lodestar cross-check can be performed with a less exhaustive cataloging and review of counsel's hours. See *In re Rite Aid Corp. Sec Litig.*, 396 F.3d 294, 306 (3d Cir. 2005) ("The lodestar cross-check calculation need entail neither mathematical precision nor bean-counting."); *Godberger v. Integrated Resources, Inc.*, 209 F.3d 43, 50 (2d Cir. 2000) ("Of course, where [the lodestar method is] used as a mere cross-check, the hours documented by counsel need not be exhaustively scrutinized"). What should be required is sworn declarations from the attorney(s) in charge of billing records for the case attesting to (1) the experience and qualifications of the attorneys who worked on the case; (2) those attorneys' customary billing rates during the pendency of the case; and (3) the hours reasonably expended (reduced if necessary in the exercise of professional billing judgment) by those attorneys in prosecuting the case.

Three figures are salient in a lodestar calculation: (1) counsel's reasonable hours, (2) counsel's reasonable hourly rate and (3) a multiplier thought to compensate for various factors (including unusual skill or experience of counsel, or the ex ante risk of nonrecovery in the litigation). In performing a lodestar cross-check, however, the multiplier is implied by the ratio of the proposed percentage fee to the computed lodestar fee. For example, for a proposed percentage fee of $250,000 and a corresponding lodestar fee of $100,000, the implied multiplier is 2.5. This implied multiplier may be assessed for reasonableness. Accordingly, the court need only consider counsel's reasonable hours and counsel's reasonable hourly rate in computing the lodestar." 2007 WL 951821 at *5.

35

### 1.      Class Counsel's Request

Class counsel requests that the court award fees based on a percentage of the common fund. The settlement agreement authorizes class counsel to seek up to $425,000 in attorneys' fees and costs without opposition by Sur la Table.[64]   In their motion, counsel requests $425,000 in fees and costs.[65]   They assert they have incurred costs of $13,071.82 and seek fees of $411,928.18. The fees sought equate to 24.12% of the final $1,707,463 settlement fund. Class counsel estimate that the lodestar is $340,850.82.[66]   Thus, the "lodestar multiplier" is 1.21.[67]   The question is whether the resulting fee award is "reasonable" under the circumstances.

### 2.      The Size of the Common Fund

The settlement agreement provides that at least $1,635,600 will be made available to pay settlement awards to class members, enhanced payments to class representatives, and attorneys' fees and costs.[68]   The amount of the settlement fund was ultimately increased to  $1,707,463 because additional class members were discovered after the settlement had been signed, and another 400 previously unknown class members submitted claim forms. Class counsel denominate

---

[64]Settlement Agreement at 5.

[65]Fees Motion at 17.

[66]*Id.* at 9.

[67]The "lodestar multiplier" is determined by dividing the percentage fee award by the lodestar calculation. Courts apply such "multipliers" to account for the risk that an attorney assumes in taking a case. See *Fischel*, 307 F.3d at 1008 ("A district court generally has discretion to apply a multiplier to the attorney's fees calculation to compensate for the risk of nonpayment"). Indeed, "[i]t is an abuse of discretion to *fail* to apply a risk multiplier [ ] when (1) attorneys take a case with the expectation that they will receive a risk enhancement if they prevail, (2) their hourly rate does not reflect that risk, and (3) there is evidence that the case was risky." *Id.* (emphasis added) (citing *WPPSS*, 19 F.3d at 1301-02).

[68]As noted, several thousand additional class members discovered after the settlement agreement were been reached and included in the settlement class. In addition, more than 400 previously unknown class members submitted claim forms. This increased the total gross settlement payment to $1,707,463.

1  this amount a common fund for purposes of calculating attorneys' fees.[69]  The precise size of the

2  fund, however, is not as straightforward as class counsel suggest.

3         As noted, payments to class members from the fund will be in the form of merchandise

4  certificates rather than cash.  As this court has previously noted, "gift cards have a cash value that

5  is less than the face amount of the card." *Fernandez v. Victoria Secret Stores, LLC,* No. CV

6  06–04149 MMM, 2008 WL 8150856, *10 (C.D. Cal. July 21, 2008).  Neither the settlement

7  agreement nor the parties' papers address the difference between the cash value of a merchandise

8  certificate and its face value.  In a similar case, however, Judge Walker of the Northern District

9  of California found that the "real economic value" of gift cards was 80 percent of their face value.

10  See *Young v. Polo Retail, LLC* (*Young I*), No. C-02-4546 VRW, 2006 WL 3050861, *5 (N.D.

11  Cal. Oct. 25, 2006); see also *In re HP Inkjet Printer Litigation*, No. 5:05–cv–3580 JF, 2011 WL

12  1158635, *6 (N.D. Cal. Mar. 29, 2011) ("The fact that the credits are nontransferable,

13  redeemable only at HP.com, and cannot be used with other coupons or discounts significantly

14  reduces their cash value").  In *Young*, a class of employees at various Polo retail stores sued Polo,

15  challenging its practice of mandating that employees purchase and wear Polo clothes while

16  working.  As part of the settlement, Polo established a fund of $1 million in cash and $500,000

17  in Polo gift cards to be paid to class members.  *Id.* at *3.  Noting that the Rule 23 Advisory

18  Committee Note provides that "[s]ettlements involving nonmonetary provisions for class members

19  . . . deserve careful scrutiny to ensure that these provisions have actual value to the class," *id.* at

20  *5 (citing FED.R.CIV.PROC. 23(2)(C)(h), Advisory Committee Notes), the court questioned the

21  economic value of the gift cards.  It concluded that "the real economic value of such a voucher

22

23  ────────────────

24         [69]Use of the "common fund" concept in a case such as this, where each class member can
   recover only a finite amount, does not affect the calculation of attorneys' fees even if a portion

25  of the fund is not claimed.  See *Young II*, 2007 WL 951821 at *4, 8 (finding that the $1.4 million
   available was a common fund despite the fact that each individual plaintiff's recovery was limited);

26  see also *Williams v. MGM-Pathe Communications Co.*, 129 F.3d 1026, 1027 (9th Cir. 1997)
   (holding that the size of the common fund was the $4.5 million made available for settlement

27  payments and precluding the district court from considering, in connection with an  award of

28  attorneys' fees, that only a fraction of that fund had been claimed by class members).

falls short of their printed value." *Id.* After ordering the parties to provide an analysis of the economic value of the gift cards, the court found that "[a]lthough anecdotal, the data suggest that the resale value of the cards ranges from 80 to 85 percent of the printed value." *Id.* It observed that such an estimate "fails to account for transaction costs," and applied the low end of the range – 80 percent – as the best approximation of the value of the cards.

The situation in *Young I* is parallel to this case in some ways and distinguishable in others. There, as here, the certificates awarded to class members were fully transferrable. In *Young I*, however, the litigation concerned employees' objection to a company policy that required that they purchase and wear Polo merchandise. Because *Young I* was based on employees' apparently negative view of Polo merchandise, it may have been less likely that class members would redeem the gift cards themselves and more likely that they would attempt to sell or transfer them. Here, conversely, each class member is by definition a customer of Sur la Table, and it may thus be more likely that they will use the merchandise certificate rather than attempt to exchange it for cash. Although the court can only speculate as to how each class member will utilize the merchandise certificate, it will apply the high end of Judge Walker's range, as it believes it reasonably likely that previous customers of Sur la Table will return to shop there. See *Fernandez*, 2008 WL 8150856 at *10 ("[C]ounsel asserts that most class members applied for employment at Victoria's Secret because they were customers of the store. Consequently, counsel urges that they are more likely to redeem the gift cards they receive than the plaintiffs in *Young* and to obtain the full value of the cards without incurring transaction costs. Although the argument is somewhat speculative, the court finds it persuasive, and thus applies the high end of Judge Walker's range of 80–85% in assessing the value of the settlement fund").

The entire settlement fund here is merchandise certificates. No cash is involved. Thus, the court reduces the economic value of the fund by 15% for purposes of measuring the reasonableness of attorneys' fees. *Id*. at *11 ("In *Young II*, the court dealt with the decreased value of the gift cards by reducing the total value of the settlement fund from $1.5 million to $1.4 million. The court then evaluated the percentage of the fund sought by class counsel against the reduced total. The court endorses this methodology. Since the entire settlement fund here is gift

cards, the court must reduce the entire fund by 85 percent to determine its economic value.  This results a valuation of $8.5 million").

For these purposes, therefore, the court values the gross settlement fund at $1,515,094.02.[70]

### 3.   Whether the Percentage of the Fund Sought by Class Counsel is Reasonable

Because the court has reduced the amount of the common fund to reflect its real economic value, the fee award sought by class counsel now constitutes a greater percentage of the total fund.  Counsel's request for $411,928.18 equals 27% of the adjusted settlement award, rather than the 24% previously calculated.  As noted, the benchmark in common fund cases is 25%.  This percentage "can be 'adjusted upward or downward to account for any unusual circumstances involved in [the] case.'"  *Fischel*, 307 F.3d at 1006 (quoting *Paul, Johnson, Alston & Hunt*, 886 F.2d at 272).  Applying the benchmark percentage to the $1,515,094.02 million common fund would result in a fee award of $378,773.50.[71]  In determining whether to depart upward or downward from the 25 percent benchmark, the court must consider "(1) the results achieved; (2) the risk of litigation; (3) the skill required and the quality of work; (4) the contingent nature of the fee and the financial burden carried by the plaintiffs; and (5) awards made in similar cases."  *In re Omnivision Technologies, Inc.*, 559 F.Supp.2d 1036, 1046 (N.D. Cal. 2008) (citing *Vizciano*, 290 F.3d at 1048-50); see also *Vasquez*, 266 F.R.D. at 492.

### a.   The Results Achieved

"The overall result and benefit to the class from the litigation is the most critical factor in granting a fee award."  *In re Omnivision Technologies, Inc.*, 559 F.Supp.2d at 1046.  Class counsel assert that the settlement provides "exceptional benefits" for class members, as each will

---

[70]The court calculated this figure by reducing the total face value of the merchandise certificates, $1,282,463.55, to 85%, or $1,090,094.02.  To that figure, it added the $425,000 in fees and costs Sur la Table agreed to pay.  This yields a gross settlement fund of $1,515,094.02.

[71]$1,515,094.02 x .25 = $378,773.50.

receive a freely transferrable $13 merchandise certificate.[72]  As noted, however, counsel have adduced no evidence and offered no argument regarding the total damages that might have been awarded had this case proceeded to trial.  It is possible that each plaintiff could have been awarded a $1,000 civil penalty, which dwarfs the value of the $13 merchandise certificate.  Compare *In re Omnivision Technologies*, 559 F.Supp.2d at 1046 (a total award of 9% of the possible damages weighed in favor of granting a requested 28% fee); *In re Immune Response Securities Litigation*, 497 F.Supp.2d 1166, 1175 (S.D. Cal. 2007) (awarding attorneys' fees of 25% of the settlement fund, despite fact that the "$10 million award *only represents approximately 12%* of the maximum provable damages assuming complete success" (emphasis added)).  Had the maximum civil penalty been awarded most plaintiffs, the total recovery would have been close to $100 million, or roughly 100 times greater than the value of the settlement fund.  Given the risks and expenses posed by further litigation, and uncertainty regarding the range of statutory damages available, the court has concluded that the value of the certificate each class member will receive is fair.  Based on the record, however, it cannot conclude that the certificate each member will receive constitutes an exceptional or excellent recovery given the maximum exposure Sur la Table faced.  This factor, therefore, does not weigh in favor of an upward departure from the 25% benchmark.[73]

### b.      The Risk of the Litigation

Counsel argue that they faced considerable risk litigating the case because it presented "novel and difficult questions regarding liability under . . . section 1747.08," and because Sur la Table disputed that a class should be certified, argued that it had not violated the statute, and that even if it had, its violations were merely technical and only nominal penalties were warranted.[74]

---

[72]Fees Motion at 3-4.

[73]The court's concerns regarding the clear sailing and kicker provisions are also relevant here.  By negotiating these provisions with Sur la Table, plaintiffs' counsel presumably used bargaining capital that could have been used to secure a better settlement for the class.  *Weinberger*, 925 F.2d at 525; *In re Bluetooth*, 654 F.3d at 948.

[74]Fees Motion at 11.

1    The court agrees.  See *In re Pacific Enterprises Sec. Litig.*, 47 F.3d at 379 (holding that fees were
2    justified "because of the complexity of the issues and the risks").  As noted, Sur la Table had a
3    potentially meritorious defense, i.e., that its Information Capture Policy authorized associates to
4    ask for personal information only after the customer had identified his or her form of tender, and
5    only if the customer voluntarily asked to be placed on the mailing list.  Sur la Table contends this
6    policy likely does not violate the Act.  See *Florez*, 108 Cal.App.4th at 451 ("[N]othing [in the act]
7    prevents a retailer from soliciting a consumer's address and telephone number for a store's mailing
8    list, if that information is provided voluntarily," and so long as the request is made after the
9    customer "makes his or her preferred method of payment known").  Thus, if Sur la Table were
10   able to prove at trial that its Information Capture Policy directed sales associates not to ask for
11   personal information until after the customer identified his or her form of tender, and only if the
12   customer voluntarily asked to be placed on the mailing list, it would likely prevail.  The fact that
13   this issue, which is at the heart of plaintiffs' case, is a subject of serious dispute favors a finding
14   that the counsel faced some risk litigating the case.  See *In re Omnivision Technologies*, 559
15   F.Supp.2d at 1046-47 ("The risk that further litigation might result in Plaintiffs not recovering at
16   all . . . is a significant factor in the award of fees").  This factor, therefore, weighs in favor of
17   a fee award at least equal to 25% of the settlement fund.

18                    **c.     The Skill Required and the Quality of Work**

19            The prosecution and management of a class action undoubtedly requires a certain degree
20   of skill, and the court found nothing deficient about the work performed by class counsel.  Given
21   that the case was settled before a certification motion or a dispositive motion had been filed or
22   heard, however, the court cannot conclude that counsel's skill and the quality of their work was
23   so exceptional as to merit an upward adjustment of their fee.  Compare *id.* at 1047 ("That
24   Plaintiffs' case withstood two [motions to dismiss], despite other weaknesses, is some testament
25   to Lead Counsel's skill").  Moreover, although each class member will receive some benefit under
26   the settlement, that benefit is not so exceptional that it demonstrates extraordinary negotiating
27   skills by counsel.  Consequently, the court concludes that this factor is neutral, favoring neither
28   an upward nor downward departure from benchmark fees.

**d.     The Contingent Nature of the Fee and the Financial Burden Carried by the Plaintiffs**

"The importance of assuring adequate representation for plaintiffs who could not otherwise afford competent attorneys justifies providing those attorneys who do accept matters on a contingent-fee basis a larger fee than if they were billing by the hour or on a flat fee." *Id.* Each of the three firms retained to prosecute this action on behalf of plaintiffs worked on a contingency fee basis. Each firm expended a substantial amount of time working on the matter, advanced money to cover litigation costs, and turned down alternate employment offering guaranteed payment because of their work on this matter.[75] As noted, counsel spent over 500 hours litigating this matter, and incurred costs of over $13,000 dollars.[76] For three small law firms, this represents a serious commitment of time and resources; this type of "substantial outlay, when there is a risk that [no money] will be recovered, further supports the award of the requested fees." *Id.* The fact that the attorneys turned down other work, which would have guaranteed them income, further supports a significant fee award. See *Vizcaino*, 290 F.3d at 1050 (noting that the representation had required counsel "to forgo significant other work," which was a relevant factor in evaluating an appropriate fee award); *WPPS*, 19 F.3d at 1299 ("It is an established practice in the private legal market to reward attorneys for taking the risk of non-payment by paying them a premium over their normal hourly rates for winning contingency cases").

Nonetheless, the financial burdens borne by class counsel, while not insignificant, are not as substantial as those many class action lawyers assume. See *In re Omnivision Technologies*, 559 F.Supp.2d at 1046-47 ("This suit began over three years ago. During that time, the various attorneys representing Plaintiffs have spent over 7500 hours litigating this case, without receiving any compensation. Counsel also advanced over $560,000 in expenses related to prosecuting this action. This substantial outlay, when there is a risk that none of it will be recovered, further

---

[75]Stonebarger Fees Decl., ¶ 5; Patterson Fees Decl., ¶ 5; Hoffman Fees Decl., ¶ 5.

[76]*Id.*, ¶ 12.

supports the award of the requested fees" (citations omitted)); *In re Immune Response Securities Litigation*, 497 F.Supp.2d at 1176 ("[T]he Court notes that counsels' representation of the Class on a contingency fee basis over approximately six years places a heavy burden on counsel and involves significant risk.  Counsel has incurred thousands of hours of attorney time and put forth hundreds of thousands of dollars in expenses on an 'at-risk' basis").  Moreover, none of plaintiffs' counsel bore the entire litigation risk; the risk and financial burden were spread across three law firms.  See *In re Wells Fargo Sec. Litig.*, 156 F.R.D. 223, 226 (N.D. Cal. 1994) ("[The] plaintiff law firms, which usually take cases on a contingent fee basis, join together to prosecute major complex cases because doing so allows them to leverage their resources and spread the risks of unfavorable outcomes"); see also *In re Fine Paper Antitrust Litigation*, 751 F.2d 562, 584 (3d Cir. 1984) (noting that "participation, on the plaintiffs' side of the case, of a number of law firms . . . may divide the work, and thus the risk").

Accordingly, the court finds that this factor weighs in favor of awarding significant fees, but not fees above the 25% benchmark.

### e.    Awards Made in Similar Cases

Class counsel argues that courts "frequently award percentage fees of more than 30% of the total fund."[77]  They fail, however, to cite to prior class actions involving violations of the Song-Beverly Credit Card Act or a comparable statute where this is true.  The court's research did not uncover cases suggesting a trend toward awarding fees of more than 25% in credit card consumer class actions.

### f.    The Lodestar Cross-Check

When a court exercises its discretion to use a percentage-of-the-fund calculation to determine the reasonableness of attorneys' fees, checking that figure against the lodestar is appropriate.  See *Vizcaino*, 290 F.3d at 1050; *Young II*, 2007 WL 951821 at *5 ("[T]he best practice is to assess a percentage fee award not only by using the usual litany of factors bearing on the reasonableness of a fee, but also by cross-checking the percentage fee award against a

---

[77]Fees Motion at 8.

rough fee computation under the lodestar method" (internal citations omitted)).  The lodestar figure is "the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate."  *Hensley*, 461 U.S. at 433.

Counsel state that over the past two years, they have recorded more than 500 hours working on this case.  Georgino's counsel, Stonebarger, states that his firm expended 253.4 hours on the matter.  Stonebarger recorded two hundred of these hours himself; his hourly rate is $650.[78] His associate, Richard Lambert, worked six hours at a rate of $500 per hour.[79]  Another associate, Elaine Yan, recorded 47.4 hours, at a rate of $350 per hour.[80]  Although Stonebarger does not provide copies of time records, his declaration provides a general breakdown of how the time was spent.[81]  Patterson, who is Peterson's attorney, adduces evidence that he recorded 140 hours working to this case, at a rate of $675 per hour.[82]  He too provides an allocation of this time among different tasks.[83]  Finally, Hoffman, Dardarian's counsel, states that his firm recorded a total of 110 hours working on the case; Hoffman expended 24 hours, at a rate of $675 per hour. His partner, Arthur Lazear, worked 3.9 hours, at a rate of $635 per hour, while their associate, Chad Saunders, worked 72.8 hours, at a rate of $500 per hour.[84]  Hoffman proffers no evidence concerning the nature of the work done by him or the other lawyers in the firm.

Ideally, class counsel would have submitted detailed time records that the court could have reviewed to determine whether the hours billed were reasonable.  The court is particularly concerned that Hoffman has provided no details regarding the 110 hours his firm spent on the

---

[78]Stonebarger Fees Decl., ¶ 6.

[79]*Id.*

[80]*Id.*

[81]*Id.*

[82]Patterson Fees Decl., ¶ 6.

[83]*Id.*

[84]Hoffman Fees Decl., ¶ 6.

matter.  Despite these deficiencies, however, "[i]n contrast to the use of the lodestar method as a primary tool for setting a fee award, the lodestar cross-check can be performed with a less exhaustive cataloging and review of counsel's hours."  *Young II*, 2007 WL 951821 at *6.  See *In re Immune Response Sec. Litig.*, 497 F.Supp.2d 1166, 1176 (S.D. Cal. 2007) ("Although counsel have not provided a detailed cataloging of hours spent, the Court finds the information provided to be sufficient for purposes of lodestar cross-check"); see also *In re Rite Aid Corp. Sec Litig.*, 396 F.3d 294, 306 (3d Cir. 2005) ("The lodestar cross-check calculation need entail neither mathematical precision nor bean-counting"); *Goldberger v. Integrated Resources, Inc.*, 209 F.3d 43, 50 (2d Cir. 2000) ("Of course, where [the lodestar method is] used as a mere cross-check, the hours documented by counsel need not be exhaustively scrutinized").

Stonebarger and Hoffman adduce evidence that the requested hourly rates for their firm's attorneys have been accepted by numerous courts.  Specifically, Stonebarger states that several courts have approved his hourly rate of $650 and Lambert's hourly rate of $500; he cites nine California state and federal court decisions supporting this assertion.[85]  Similarly, Hoffman cites eight California state and federal court decisions approving his hourly rate of $675.[86]  Patterson cites no evidence supporting the reasonableness of his rate.  Based on the record, however, it appears that Patterson – head of the Patterson Law Group – has  litigation and class action experience comparable to that of Stonebarger and Hoffman.[87]  His hourly rate of $675 is in line

---

[85]Stonebarger Fees Decl., ¶ 7.  Stonebarger's evidence includes decisions from courts in the Central, Northern, and Eastern Districts of California, Los Angeles Superior Court, Napa County Superior Court, Placer County Superior Court, Stanislaus County Superior Court, and San Francisco Superior Court.

[86]Hoffman Fees Decl., ¶ 8.  Hoffman cites decisions in the Northern and Southern Districts of California, Los Angeles Superior Court, San Francisco Superior Court, and Alameda Superior Court.

[87]Patterson Fees Decl., ¶ 9 ("I have extensive experience in complex business litigation and class actions.  My firm substantially concentrates its practice in the prosecution of class actions and I have successfully served as Class Counsel or Co-Class Counsel prosecuting numerous Class Actions to Judgment against large corporations for violations of California's Song-Beverly Credit Card Act, recovering tens of millions of dollars in benefits for individuals across the country").

with theirs.  Keeping in mind that the lodestar calculation need not be wholly precise when utilized

as a cross-check on a percentage-of-the-fund award, the court finds his rate reasonable as well.

See *Faigman v. AT & T Mobility LLC*, No. C06–04622 MHP, 2011 WL 672648, *5 (N.D. Cal.

Feb. 16, 2011) ("[T]his court [finds] reasonable attorneys fees based on rates of $650 for partner

services [and] $500 for associate attorney services"); *Suzuki v. Hitachi Global Storage

Technologies, Inc.*, No. C 06-7289 MHP, 2010 WL 956896, *3 (N.D. Cal. Mar. 12, 2010)

("[T]he court finds that appropriate rates in the current action should not exceed $650 for the

partner attorney, $500 for the associate attorney").

The court is concerned, however, that three senior lawyers apparently performed the bulk

of the work on this case, and that the lodestar number being used as a cross-check is inflated as

a result.  No substantive motions were filed or heard in this case, and it does not appear from the

attorneys' description of the tasks they performed that any overly complex work was involved.

Rather, it appears that the bulk of class counsel's time was spent on fairly routine tasks that did

not require the knowledge or expertise of senior attorneys.  Stonebarger, for example, indicates

that his firm spent 40.1 hours "[r]eview[ing] and [a]naly[zing] . . . [i]nformation and [d]ocuments

[p]roduced by [d]efendant," and "[r]esearch regarding the [s]ame."[88]  He states that 30.8 hours

were spent "[r]eview[ing] [m]iscellaneous [b]riefs, [p]leadings, [and] [s]tipulations," and that 21.5

hours were expended on "[m]iscellaneous [c]orrespondence."[89]  From these descriptions, the work

does not appear to have required the skill and experience of a senior attorney, charging $650 per

hour.

Like Stonebarger, Patterson is a senior attorney.  He was the only lawyer in his firm

working on this matter; he states that he spent 14 hours "[r]eview[ing] [r]emoval [p]apers and

[l]egal [r]esearch regarding [the] [a]ppropriateness of [r]emoval and [r]emand"; 8 hours

"[r]eview[ing] and [a]naly[zing] . . . [i]nformation and [d]ocuments [p]roduced by [d]efendant,"

and conducting "[r]esearch regarding the [s]ame"; 7 hours conducting "[m]iscellaneous [l]egal

---

[88]Stonebarger Fees Decl., ¶ 6.

[89]*Id.*

46

1   [r]esearch and [a]nalysis;" and 14 hours on "[m]iscellaneous [c]orrespondence."    Like

2   Stonebarger, Patterson appears to have spent a significant amount of time on tasks that do not

3   typically require the services of a lawyer billing $675 per hour.  See *In re HPL Technologies, Inc.*

4   *Securities Litigation*, 366 F.Supp.2d 912, 920-21 (N.D. Cal. 2005) (noting the "unusually large

5   fraction of senior attorney time devoted to settlement" in calculating reasonable attorneys' fees);

6   *Sines v. Service Corp. Intern.*, No. 03 Civ. 5465(PKC),  2006 WL 1148725, *2 (S.D.N.Y. May

7   1, 2006) ("A senior lawyer for plaintiffs, who billed over 1,400 hours on the matter, elected to

8   use no other lawyers at lower billing rates to perform service. . . . [M]uch of the work could have

9   been done by lawyers, paralegals, technology experts or secretaries billing at much lower rates

10  with a net efficiency. . . .  I conclude that, of the 636.4 hours of the senior lawyer's time billed

11  at $485 and 576.7 hours at $550 per hour, 20% could have been performed by persons billing at

12  $275 per hour or less").

13          The court is also skeptical that the total hours billed – 503.4 – are reasonable.  It is true

14  that counsel have been working on the matter for almost two years, and that prior to consolidation,

15  three separate complaints were drafted and three separate cases initiated.  Counsel has not had to

16  engage in any motion practice, however, nor does it appear that they prepared for or conducted

17  depositions of plaintiffs or other witnesses.[90]  Compare *Schiller v. David's Bridal, Inc.*, No.

18  1:10–cv–00616–AWI–SKO, 2012 WL 2117001, *21 (E.D. Cal. June 11, 2012) ("The Court finds

19  the 596.2 hours expended on the litigation to be reasonable *in light of law and motion practice*

20  with respect to subject matter jurisdiction, the amount of discovery conducted, the number of

21  Defendant's employees included in the Settlement Classes, and the mediation preparation

22  required" (emphasis added)).  Moreover, it appears, based on the evidence submitted, that counsel

23  likely billed for unnecessarily duplicative work.  For example, Stonebarger spent 29 hours

24  "[d]raft[ing] [the] [p]reliminary [a]pproval [p]apers and [s]upporting [d]eclarations [and

25

26

27          [90]This is based on counsels' time allocations and the fact that no counsel has billed time for

28  depositions.

47

conducting] [l]egal [r]esearch [r]egarding [p]reliminary [a]pproval."[91]  Patterson billed 12 hours performing precisely the same tasks.  In fact, Patterson duplicated each of the ten categories of tasks Stonebarger asserts he performed.  Absent additional evidence, the court is compelled to conclude that the fact that three law firms were involved in plaintiffs' representation led to at least some unnecessarily duplicative work.  It thus finds that the 503 hours counsel report they spent on this matter inflates the lodestar even for cross-check purposes.[92]  See, e.g., *In re KeySpan Corp. Securities Litigation*, No. 01 CV 5852(ARR), 2005 WL 3093399, *17 (E.D.N.Y. Sept. 30, 2005) ("Because the lodestar calculation of Class Counsel is, at best, inflated, its use as a cross check of the reasonableness of the fee award is of limited usefulness"); *id*. at *18 ("Under these circumstances, any lodestar cross check should be based on billings that have some semblance of reasonableness"); see also *In re Ins. Brokerage Antitrust Litigation*, 579 F.3d 241, 284 (3d Cir. 2009) (noting, in a case where the lodestar was being used as a cross-check, that "district courts must be aware of the potential for manipulation of the lodestar and lodestar multiplier").

If the court calculates the lodestar using counsel's rates and the hours they recorded, proffered by counsel, it would be $340,850.82.  Counsel seek $411,928.18 in fees, or a multiplier of 1.21.[93]  If the court were to use a blended rate of $550 given the excessive number of hours recorded by senior attorneys on relatively routine tasks, see *In re HPL Technologies, Inc. Securities Litigation*, 366 F.Supp.2d at 920-21 ("Billing all attorney time at a 'blended' hourly rate is probably appropriate in most lodestar cross-check computations for two reasons.  First, it simplifies calculations.  Second, it encourages economically efficient allocation of work within class counsel's firm.  Third, it avoids the problem of 'experience inflation'"), and to reduce the number of hours to account for duplicative work by a modest 5%, the lodestar would be $261,910

---

[91]Stonebarger Fees Decl., ¶ 6.

[92]As noted, the amount of time Hoffman spent on various tasks is unknown, as he has adduced no evidence of the nature of the tasks he performed or how long it took him to perform them.

[93]$411,928.18 / $340,850.82 = 1.21.

and the multiplier would be 1.57.

In some cases, an upward adjustment of this magnitude is appropriate to compensate attorneys for assuming significant risks. See *Fischel v. Equitable Life Assur. Society of U.S.*, 307 F.3d 997, 1008 (9th Cir. 2002) ("It is an abuse of discretion to fail to apply a risk multiplier, however, when (1) attorneys take a case with the expectation that they will receive a risk enhancement if they prevail, (2) their hourly rate does not reflect that risk, and (3) there is evidence that the case was risky," citing *In re WPPS*, 19 F.3d at 1301-02). Here, however, counsel adduce no evidence that they took this case in the expectation that they would receive a risk multiplier. Compare *id.* (awarding a risk multiplier because counsel submitted a declaration stating that he "would not have undertaken this litigation on a contingent fee basis had it been thought that there was any likelihood of a fee being restricted to a small percentage of the amounts recovered"). The Ninth Circuit has expressly held, moreover, that the simple fact counsel took the case on a contingency fee basis, without more, does not merit an increase in the lodestar amount, as the risk that counsel will not be compensated is "subsumed within the initial calculation of hours reasonably expended at a reasonable rate." *In re Bluetooth*, 654 F.3d at 943 n. 7 ("*Kerr* identifies twelve factors relevant to a determination of reasonable attorneys' fees. . . . At least one factor is no longer valid – whether the fee was fixed or contingent," citing *Davis v. City and Cnty. of San Francisco*, 976 F.2d 1536, 1546 (9th Cir. 1992), vacated in part on other grounds, 984 F.2d 345 (9th Cir. 1993)); see also *City of Burlington v. Dague*, 505 U.S. 557, 563 (1992) ("The risk of loss in a particular case (and, therefore, the attorney's contingent risk) is the product of two factors: (1) the legal and factual merits of the claim, and (2) the difficulty of establishing those merits. The second factor, however, is ordinarily reflected in the lodestar – either in the higher number of hours expended to overcome the difficulty, or in the higher hourly rate of the attorney skilled and experienced enough to do so. Taking account of it again through lodestar enhancement amounts to double counting" (internal citations omitted)). Finally, even at the blended rate used by the court to calculate the lodestar, it appears counsel's rates reflected the risk they undertook. Consequently, using the lodestar it calculated as a cross-check, the court concludes that an upward departure from the 25% benchmark is not warranted in this case, since a fee award of

1   25% of the common fund, or $378,773.50, represents a lodestar multiplier of 1.45.

2                   **g.    Conclusion Regarding Class Counsel's Fees**

3           In sum, considering the overall circumstances of the case, and comparing the lodestar and

4   percentage methods of calculating the fee, the court concludes that awarding a fee equal to 25% of

5   the value of the common fund is reasonable. The court declines to award counsel requested fees

6   of $411,928.18, but rather awards $378,773.50, or 25% of the recalculated value of settlement

7   award.[94]

8           **E.    Whether Counsel's Request for Litigation Costs is Reasonable**

9           The district court also has discretion to determine an appropriate award of litigation costs.

10  See *Trans Container Services v. Security Forwarders, Inc.*, 752 F.2d 483, 488 (9th Cir. 1985).

11  One court has noted that, in evaluating the reasonableness of costs, "the judge has to step in and

12  play surrogate client." See *In re Continental Illinois Securities Litig.*, 962 F.2d 566, 572 (7th Cir.

13  1992). In keeping with this role, the court must examine prevailing rates and practices in the legal

14  marketplace to assess the reasonableness of the costs sought. *Missouri v. Jenkins*, 491 U.S. 274,

15  286-87 (1989).

16          Counsel request a total of $13,071.82 in costs.[95] With the court's permission, class counsel

17  submitted supplemental declarations containing an itemized breakdown of the costs incurred. The

18

19          [94]After conducting the lodestar cross-check, the court gave consideration to adjusting the
20  25% benchmark downward. In addition to the factors discussed, however, courts often consider
    the reaction of the class to a proposed award of attorneys' fees in order to gauge its
21  reasonableness. See *Craft v. County of San Bernadino*, No. EDCV05-00359 SGL, 2008 WL
    916965, *3 (C.D. Cal. Apr. 1, 2008) (noting that courts often review "the reaction of the class"
22  when determining whether to award fees). Here, as noted, no objections to the settlement have
23  been filed, and only two of the nearly 100,000 class members have elected to opt out. This
    overwhelming support for the settlement agreement supports a conclusion that the agreement is
24  reasonable and a typical 25% award is warranted. See *Wren*, 2011 WL 1230826 at *29 ("The
    overwhelming participation in the settlement and the minimal number of objections suggest that
25  counsel obtained a favorable result for the class and support an increase from the standard
26  [attorneys' fee] award").

27          [95]Fees Motion at 15; see also Stonebarger Fees Decl., ¶ 6; Patterson Fees Decl., ¶ 8;
28  Hoffman Fees Decl., ¶ 6.

court has reviewed the detailed accounting submitted and finds that all of the expenses were reasonably and necessarily incurred during the course of the litigation.  The most significant cost is $5,000 paid to the mediator.[96]  This expenditure was reasonable, particularly given the ultimate success of the mediation.  The remainder of the costs are such things as filing fees, mailings, and travel expenses, which are traditionally awarded in cases of this type.  The court therefore grants counsel's request for $13,071.82 in expenses.[97]

### F.    Whether the Requested Incentive Awards are Reasonable

An individual who joins her claims with those of a class "disclaim[s] any right to a preferred position in the settlement [of those claims]."  *In re Oracle Securities Litigation*, No. C-90-0931-VRW, 1994 WL 502054, *1 (N.D. Cal. June 18, 1994) (quoting *Officers for Justice*, 688 F.2d at 632).  Nonetheless, it is well-established that the court may grant a modest incentive award to class representatives, both as an inducement to participate in the suit and as compensation for time spent in litigation activities, including depositions.  See *In re Mego Financial Corp. Securities Litig.*, 213 F.3d at 463 (the district court did not abuse its discretion in approving an incentive award to the class representatives); *In re Continental Illinois Securities Litig.*, 962 F.2d at 571 (stating that an incentive award in such amount "as may be necessary to induce [the class representative] to participate in the suit" is appropriate).

The settlement agreement provides for an incentive payment of $4,000 to each of the three

---

[96]Supplemental Declaration of Gene Stonebarger, Docket No. 41 (April 25, 2013), Exh. A; Supplemental Declaration of James R. Patterson, Docket No. 41 (April 25, 2013), Exh. 1; Supplemental Declaration of Tim Hoffman, Docket No. 41 (April 25, 2013), Exh. 1.

[97]Counsel's motion sought an award of $13,071.82 in costs.  The request was tentatively denied because class counsel provided no documentation of the costs.  At the hearing, counsel sought leave to file supplemental evidence concerning their costs, which the court allowed.  The supplemental evidence indicated that class counsel had incurred $14,346.93 in costs.  The court granted counsel leave to adduce evidence of the amount of costs sought in the motion – $13,071.82.  It did not grant counsel leave to adduce evidence of additional costs incurred after the filing of the fees motion, and to increase the amount requested.  Doing so would reward counsel for their failure to provide evidence of costs in the first instance.  Therefore, the court awards only the $13,071.82 originally requested.

named plaintiffs.  This proposed award is consistent with the size of awards that many courts have found appropriate.  See, e.g., *In re Mego Financial Corp.*, 213 F.3d at 463 (approving a $5,000 incentive award for each class representative); *Faigman v. AT & T Mobility LLC*, No. C06-04622 MHP, 2011 WL 672648, *5 (N.D. Cal. Feb. 16, 2011) (approving an incentive payment of $3,333.33 for each of three class representatives, and noting that "[i]n [the Northern] [D]istrict, incentive payments of $5,000 are presumptively reasonable"); *Clesceri v. Beach City Investigations & Protective Services, Inc.*, No. CV-10-3873-JST (RZx), 2011 WL 320998, *2 (C.D. Cal. Jan. 27, 2011) (preliminarily approving an award of $3,000 for two named plaintiffs); *Hartless v. Clorox Co.*, 273 F.R.D. 630, 646-47 (S.D. Cal. 2011) (approving an award of $4,000 for one named plaintiff and $2,000 for another); *Dennis v. Kellogg Co.*, No. 09-CV-1786-IEG (WMc), 2010 WL 4285011, *3 (S.D. Cal. Oct. 14, 2010) (preliminarily approving an incentive award of $5,000); *Aguayo v. Oldenkamp Trucking*, No. F04-6279 AWI LJO, 2006 WL 3020943, *10 (E.D. Cal. Oct. 17, 2006) (preliminarily approving a settlement agreement, which provided that class counsel would apply for an incentive award of no more than $5,000 for the named plaintiff).

Whether to authorize an incentive payment to a class representative is a matter within the court's discretion.  The criteria courts apply in determining whether to approve an incentive award include "1) the risk to the class representative in commencing suit, both financial and otherwise; 2) the notoriety and personal difficulties encountered by the class representative; 3) the amount of time and effort spent by the class representative; 4) the duration of the litigation[;] and[ ] 5) the personal benefit (or lack thereof) enjoyed by the class representative as a result of the litigation." *Van Vranken v. Atlantic Richfield Co.*, 901 F.Supp. 294, 299 (N.D. Cal. 1995).

### 1.    The Risk to the Class Representative in Commencing Suit

When a class representative shoulders some degree of personal risk in bringing litigation, such as workplace retaliation, approving an incentive award is especially important.  See *Staton*, 327 F.3d at 977 (noting that fear of workplace retaliation is a relevant factor in evaluating the propriety of an incentive award).  None of the named plaintiffs proffers evidence that their decision to sue subjected them any risk of retaliation.  Counsel, however, assert that plaintiffs

1    risked liability for Sur la Table's litigation costs had they not prevailed at trial.[98]   Presumably,

2    counsel reference Rule 54(d)(1) of the Federal Rules of Civil Procedure, which provides that

3    "costs – other than attorney's fees – should be allowed to the prevailing party."  See *Champion*

4    *Produce, Inc. v. Ruby Robinson Co., Inc.*, 342 F.3d 1016, 1022 (9th Cir. 2003) ("An award of

5    standard costs in federal district court is normally governed by Federal Rule of Civil Procedure

6    54(d), even in diversity cases.  Rule 54(d)(1) creates a presumption in favor of awarding costs to

7    a prevailing party, but the district court may refuse to award costs within its discretion" (internal

8    citation omitted)).  Whether costs can be imposed on a lead plaintiff in a class action is unsettled.

9    See *Whiteway v. FedEx Kinkos Office & Print Services, Inc.*, No. C 05-2320 SBA, 2007 WL

10   4531783, *3 (N.D. Cal. Dec. 17, 2007) (noting that "there is very little case law directly

11   considering the question of taxing costs against the lead or named plaintiff in a class action," but

12   that "the few courts to consider this 'class representatives dilemma' have not found it inequitable

13   to assess costs upon the lead or named plaintiff in a class action").  Because counsel entered into

14   a contingency fee agreement with plaintiffs, however, it is unclear whether plaintiffs would

15   ultimately have been responsible for shouldering Sur la Table's costs even had they been taxed.

16   Some contingency fee contracts place that burden on the clients while others do not. Because the

17   potential risk faced by plaintiffs is uncertain, this factor is neutral.

18                    **2.    The Notoriety and Personal Difficulties Encountered by the Class**

19                           **Representative**

20          There is no particular notoriety associated with this litigation, nor is there any indication

21   that plaintiffs have been subjected to media attention as a result of their involvement in the case.

22   See, e.g., *Wilson v. Airborne, Inc.*, No. EDCV 07-770-VAP (OPx), 2008 WL 3854963, *13

23   (C.D. Cal. Aug. 13, 2008) (finding that the media attention class representatives attracted

24   supported incentive awards).  The fact that there was no media attention, however, does not

25   preclude approval of an incentive payment.  See *Razilov v. Nationwide Mut. Ins. Co.*, No.

26   01-CV-1466-BR, 2006 WL 3312024, *4 (D. Or. Nov. 13, 2006) (approving an incentive award

27   _____

28          [98]Fees Motion at 16.

                                              53

of $10,000 despite a lack of notoriety or demonstration of personal difficulties).  As no significant

media attention or other difficulties have been identified, however, this factor favors authorizing

only a modest incentive award.

### 3.    The Amount of Time and Effort Expended by the Class Representative

An incentive award is appropriate where, as here, the "class representatives remained fully

involved and expended considerable time and energy during the course of the litigation."  *Razilov*,

2006 WL 331204 at *4.  Class counsel represent that it was plaintiffs who initiated the lawsuits,

and that since their inception, "[p]laintiffs [have] actively participated in the litigation;"[99] for

example, "each [plaintiff] spent a significant amount of time participating in interviews, meetings

and telephone consultations with [c]lass [c]ounsel . . . [and] also spent numerous long hours

gathering information in support of [her] claims and responding to inquiries."[100]  Plaintiffs also

"helped [c]lass [c]ounsel prepare the complaint, [prepare] for mediation, and [prepare] the briefing

related to approval of the settlement."[101]  Counsel praise plaintiffs for their involvement and assert

that they deserve incentive payments "in recognition of . . . [their] involvment, personal

sacrifices, and achieved results."[102]  *In re Heritage Bond Litigation*, No. 02–ML–1475 DT, 2005

WL 1594403, *14 (C.D. Cal. June 10, 2005) (activities such as "responding to discovery,

preparing for, traveling to and attending their depositions and maintaining contact with Plaintiffs'

counsel to monitor the litigation" gave rise to an inference that class representatives were "actively

involved in every aspect of . . . litigation"); *Hartless*, 273 F.R.D. at 646-64 (awarding one

plaintiff $4,000 and another $2,000 because "[p]laintiff Hartless has protected the interests of the

class and has spent the past four years meeting with counsel, supervising counsel's efforts on

---

[99]Stonebarger Fees Decl., ¶ 4.

[100]*Id.*

[101]*Id.*  See also Hoffman Fees Decl., ¶ 4 ("Nancy Dardarian has dedicated a substantial amount of time and effort representing the [c]lass, including meetings with [c]lass [c]ounsel, producing required discovery disclosures, and participating in settlement discussions").

[102]Stonebarger Fees Decl., ¶ 4.

behalf of the class, participating in discovery and efforts leading to settlement, and approving the amount and type of settlement proposed for the class").  Consequently, this factor suggests that an incentive award should be approved.

### 4. The Duration of the Litigation

When litigation has been particularly protracted, an incentive award is especially appropriate.  See *Van Vranken*, 901 F.Supp. at 299 (finding that a class representative's participation through "years of litigation" supported an incentive award).  This litigation has been pending for just over two years, which although substantial, is not an unusually long period of time.  This factor, therefore, weighs only slightly in favor of approving the incentive award.

### 5. The Personal Benefit Enjoyed by the Class Representative as a Result of the Litigation

An incentive award may be appropriate when a class representative will not gain any benefit beyond that she would receive as an ordinary class member.  See *Razilov*, 2006 WL 331204 at *4 (approving the payment of an incentive award where the only benefit a class representative was going to receive from a settlement was the same statutory damages that other class members would receive); *Van Vranken*, 901 F.Supp at 299 (where a class representative's claim made up "only a tiny fraction of the common fund," a substantial incentive award was appropriate).  There is no evidence that the named plaintiffs here have received or will receive any unusual or extraordinary benefit from the settlement; rather, it appears that absent an incentive award they will receive only the $13 merchandise certificate that is due all class members.  This factor, therefore, favors approval of an incentive award.

### 6. Weighing the Factors

Overall, the factors favor approving an incentive award.  Given the evidence class counsel has provided concerning plaintiffs' participation in the litigation, and the fact that they do not stand to gain any benefit beyond that received by ordinary class members in the absence of an award, a modest award of $4,000 per named plaintiff is appropriate.

55

**III. CONCLUSION**

In conclusion, the court grants the motion for final approval and the motion for attorneys' fees and incentive awards.  It awards class counsel  $378,773.50 in fees, $13,071.82 in costs, and the three named plaintiffs $12,000 in incentive awards, to be divided equally among them.


DATED: May 9, 2013

_____
MARGARET M. MORROW
UNITED STATES DISTRICT JUDGE